*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0397p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RODERICK DAVIE,

> *Petitioner-Appellant,*

*v.*

No. 03-4293

BETTY MITCHELL, Warden,

> *Respondent-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-02400—James G. Carr, Chief District Judge.

Argued: July 18, 2007

Decided and Filed: November 12, 2008

Before: MERRITT, COLE, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:** David C. Stebbins, FEDERAL PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, Kathleen A. McGarry, McGARRY LAW OFFICE, Glorieta, New Mexico, for Appellant. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** David C. Stebbins, FEDERAL PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, Kathleen A. McGarry, McGARRY LAW OFFICE, Glorieta, New Mexico, for Appellant. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

ROGERS, J., delivered the judgment of the court and an opinion. COLE, J. (pp. 17-23), delivered a separate concurring opinion. MERRITT, J. (pp. 24-34), delivered a separate dissenting opinion.

---

## OPINION

---

ROGERS, Circuit Judge. The Ohio courts have upheld the sentence of defendant Roderick Davie to death for the brutal and gruesome murder of two victims. He was also convicted on an attempt to kill a third. On a subsequent petition for a federal writ of habeas corpus, the district court below rejected contentions that defendant's *Miranda* rights had been violated, that his penalty-phase jury instructions had been constitutionally deficient, and that prosecutorial conduct had denied him due process. These determinations were correct, notwithstanding Davie's arguments on appeal.

1

With respect to the *Miranda* claim in particular, the substantial deference that the law requires us to give to the state court's application of United States constitutional law in habeas cases compels us to uphold the Ohio courts' denial of Davie's *Miranda* claim. Indeed, even fresh application of Supreme Court precedent shows that Davie's *Miranda* rights were not violated by the police actions in this case, which included four instances of questioning—each following a *Miranda* warning—over a six-hour period.

## I.

On June 27, 1991, Davie killed John Coleman and Tracey Jefferys, and tried to kill John Everett. In a taped confession, Davie admitted that he "flipped out" the morning of the crime and "went down to VCA and shot 'em up." He described how he entered the building, made his three victims lie on the floor, and shot them. He described how he beat one victim with a chair when he ran out of bullets, and attempted to run down one victim with a truck. He also described his activities after he committed the shootings.

At trial, Donna Smith, an eye witness, testified that, as she approached the Veterinary Companies of America ("VCA") warehouse on the morning of the shootings, she noticed a bleeding man stumble across the parking lot and collapse on a sidewalk. JA 901-05. Smith then noticed another man come out of the building and run around to the driver's side of a truck in the dock area. Thereafter, Smith testified that the truck came "flying out" of the parking lot across both lanes of the street in an attempt to hit the injured man. The injured man was able to shield himself from the truck by falling underneath a bridge, and the truck rammed into the bridge. Smith testified that the man in the truck left the truck and jumped over the side of the bridge.

John Everett, one of Davie's victims and the man that Smith witnessed stumble across the parking lot, testified to the following events. JA 906-47. On the morning of the shootings, Everett was in the VCA lunch room. Davie, accompanied by a crying Tracey Jefferys (another VCA employee), came up from behind Everett holding a gun. Davie ordered Everett out of the lunch room and, once in the warehouse area, ordered Everett and Jefferys to "lay face down." Davie then ordered John Colman, who was loading his truck at the loading dock, to join Everett and Jefferys. After Everett, Jefferys, and Coleman had complied with Davie's commands, Davie began shooting. Everett testified that after numerous shots were fired, Jefferys got up and ran away. Davie brought Jefferys back, and Everett heard Davie remark to Coleman "You ain't dead yet, huh, brother?" and fire another shot. Everett testified that Davie then took Everett's wallet and told Jefferys that she was lucky that he was out of bullets. At that point, Jefferys again attempted to flee, and Davie followed. Everett heard Jefferys scream for three or four minutes and, eventually, the screaming stopped.

Everett escaped the warehouse and made his way out of the building and to the street. Thereafter, Everett noticed Davie revving the engine of a truck in the parking lot. Davie attempted to use the truck to run Everett down, but Everett escaped by jumping under a bridge. Everett heard the truck crash into the bridge and, shortly thereafter, Davie arrived under the bridge. At that time, Davie began beating Everett with a stick on the left side of Everett's head, and attempted to gouge Everett's eyes out with the stick. Everett testified that Davie had the look of "a man on a mission and he was definitely going to kill me." At some point, Davie stopped beating Everett, looked up over the bridge, and left the area. Everett was treated at the hospital for, among other things, three gunshot wounds—one to the head, one to the shoulder, and one to the arm.

There is no need to summarize the remainder of the trial testimony. It is sufficient to say that the testimony established overwhelmingly that Davie committed a bloody and gruesome series of crimes on the morning of June 27, 1991. Testimony established that Tracey Jefferys died in VCA's lunch room due to blunt force trauma. A metal folding chair was found next to her body. Coleman

died in the warehouse as a result of five bullet wounds—two of which were located in the back of his head.

The circumstances of Davie's confession, detailed more fully in the concurrence, are as follows. At approximately 8:30 a.m., Davie was arrested, read his *Miranda* rights, and transported to the police station. At approximately 9:05 a.m. at the police station, Detective Hill read Davie his *Miranda* rights with Lieutenant Carl Blevins present. Davie initialed the rights form but refused to sign the waiver. At that point, the officers made no attempt to interrogate Davie. At approximately 9:59 a.m., Captain Downs and Blevins entered the interrogation room and again advised Davie of his *Miranda* rights. Davie initially made some comments, he ultimately declined to speak further with the officers, and the interview ceased. At approximately 12:15 p.m., authorities again questioned Davie. Davie provided some information to police, including the fact that he had his gun with him that morning, but he did not confess to the crime. At 12:35 p.m., Davie indicated that he had nothing more to say and the interview ceased. At approximately 2:00 p.m., Davie indicated that he wanted to speak with Detective Vingle. After Vingle advised him of his *Miranda* rights, Davie confessed. *See* 686 N.E.2d 245, 256 (Ohio 1997). At no time during the relevant events did Davie ask for a lawyer.[1]

## II.

## A.

Davie claims that the state trial court unconstitutionally admitted his confession into evidence. The deference that we owe to state court determinations regarding constitutional law on federal habeas requires that we uphold the Ohio Supreme Court's rejection of Davie's *Miranda* claim. The law by now is clear that under AEDPA, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *See Williams v. Taylor*, 529 U.S. 362, 410 (2000) (emphasis in original). Instead of asking whether the state court's application was erroneous, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. Our task in this case is to evaluate the Ohio Supreme Court's application of U.S. Supreme Court precedents for reasonableness, not to undertake an independent evaluation.

After detailing the events leading to Davie's statements, the Ohio Supreme Court reasoned:

> Contrary to Davie's arguments, he did not unequivocally assert his constitutional rights. Instead, he waived his right to remain silent during both interviews with Vingle and Sines, despite his failure to initial the waiver-of-rights portion of the form. This situation is similar to that in *State v. Scott* (1980), 61 Ohio St. 2d 155, 15 O.O.3d 182, 400 N.E.2d 375, which followed the decision in *North Carolina v. Butler* (1979), 441 U.S. 369. In *Butler*, the Supreme Court noted that "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *Id.* at 373. In *Scott*, the accused acknowledged that he understood his *Miranda* rights, but refused to sign a waiver form. Nevertheless, he agreed to answer questions and never requested counsel. The *Scott* court upheld the admissibility of

---

[1] It overstates things to say that Davie was "confronted" "*six times* within a 5-1/2 hour period between his arrest at 8:30 A.M. that morning and his confession around 2:00 P.M. that afternoon." Dissent at 24. Such a count includes the interaction between Davie and Sergeant Massucci when Massucci went to Davie's cell only to take photographs, and also the interaction (hardly a confrontation) between Davie and Detective Vingle after Davie himself requested Vingle's presence. All told, Davie was read his *Miranda* rights four times in the almost six hour period between his arrest and his request to speak with Vingle, and officers interacted with Davie at the police station three times in almost five hours before Davie initiated contact with Vingle and confessed.

the accused's statements and held, "[T]he question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in *Miranda* * * *." *Scott* at paragraph one of the syllabus. The similar facts of this case demonstrate that Davie waived his *Miranda* rights even though he failed to initial the waiver part of the form.

When Davie indicated in his interview with Blevins and Hill that he no longer wished to talk, his requests were scrupulously honored by the officers. However, in cutting off the earlier interviews, Davie did not preclude a later interrogation by other officers. See *Michigan v. Mosley* (1975), 423 U.S. 96, 104. Moreover, Davie never asserted his right to have counsel present.

Finally, it is clear that Davie's 2:00 p.m. conversation with police, in which he implicated himself in the murders, was properly admitted, since he initiated that conversation himself. See *Edwards v. Arizona* (1981), 451 U.S. 477, 485.

686 N.E.2d at 256-57(citations omitted).

Even if we might find a way to disagree with the unanimous opinion of the Ohio Supreme Court in this regard, that court's analysis amounts to a thoughtful and certainly reasonable application of United States Supreme Court law, as explained in detail by Judge Carr in the district court below. *See* 291 F. Supp. 2d 573, 595-600 (N.D. Ohio 2003). The district court accordingly properly denied habeas relief on this ground.

## B.

Indeed, the reasonableness of the state court's analysis is supported by a fresh application of Supreme Court precedents to the record in this case. Even under a nondeferential analysis, the police did not violate Davie's constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

## 1.

The Ohio Supreme Court's determination that Davie initiated the 2 p.m. conversation is directly supported by the Supreme Court's decision in *Oregon v. Bradshaw*, 462 U.S. 1039 (1983). In *Bradshaw*, a plurality of the Supreme Court concluded that authorities could speak to a defendant, without depriving him of his rights, when the defendant asked "Well, what is going to happen to me now?" even though the defendant had previously invoked his right to counsel. *See id.* at 1041-42. Because, in asking this question, the defendant had "evinced a willingness and a desire for a generalized discussion about the investigation," *id.* at 1045-46, the plurality concluded that the admission of evidence was proper so long as the defendant had knowingly and intelligently waived his rights to counsel and silence. *Id.* at 1046.

Here, like the defendant in *Bradshaw*, Davie evinced a willingness to discuss the investigation without influence by authorities. Indeed, the question that Davie asked of Vingle was related to the very subject matter of the criminal investigation for which Davie had been detained. *See id.* at 1053-54 (Marshall, J., dissenting). This court, in *United States v. Whaley*, 13 F.3d 963 (6th Cir. 1994), has reconciled the plurality and dissent in *Bradshaw* as stating a general rule that "an *Edwards* initiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case." *Id.* at 967. In this case, Davie was placed in a jail cell at approximately 12:35 p.m. About an hour and a half later, Sergeant Massucci went to Davie's cell for the purpose of obtaining Davie's photograph. When Massucci arrived, Davie asked him for permission to make a phone call. After returning from the phone call, Davie told Massucci that he wished to speak to Detective Vingle. When Vingle arrived, Davie asked Vingle how the news media had obtained information about Davie and his girlfriend, and inquired of

Vingle, "What did Styx tell you?" Styx, of course, was Dwayne Thomas, the informant who originally contacted the police and who was with Davie before Davie was arrested. It was after this interaction between Vingle and Davie—initiated by Davie—that Davie confessed to the shooting. Vingle brought Davie to an interview room, re-advised Davie of his *Miranda* rights, and Davie confessed on tape.

Under the analytical framework of the *Bradshaw* plurality, Davie's confession was properly admitted at trial. First, Davie initiated contact with the police after he invoked his right to silence. The record indicates that one and a half hours after Davie was placed in a jail cell, Davie requested to see Vingle and questioned Vingle in a manner directly pertaining to the investigation. There is no evidence in the record that either Davie's request to see Vingle or Davie's questioning of Vingle was the product of improper influence on the part of the police. Davie was in his cell for an hour and a half before requesting Vingle's presence, and the record establishes that Massucci merely took photographs of Davie and granted Davie's request to make a phone call.

*Rhode Island v. Innis*, 446 U.S. 291 (1980), in no way supports a contrary conclusion that the 2:00 p.m. encounter was not a sufficient initiation of contact under *Bradshaw*. *See* Dissent at 33. The issue in *Innis* was what police statements amount to interrogation so as to violate *Miranda* once a suspect has invoked his *Miranda* rights. The Court concluded that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." 446 U.S. at 300-01. In that case, the defendant invoked his right to counsel but later revealed the location of a gun used in a robbery after one of the officers, in the defendant's presence, remarked to another officer that there were "a lot of handicapped children running around in this area" and "God forbid one of them might find a weapon with shells." *Id.* at 294-95. The Court held that this was *not* the functional equivalent of express questioning, *id.* at 302, and, in any event, the police made no such comments to Davie in this case. After making a phone call, Davie initiated the contact with Vingle on his own, and in the absence of any police influence. Davie's questioning of Vingle clearly evinced a willingness to talk about the subject matter of the investigation, thereby satisfying the first requirement of *Bradshaw*.

Second, the totality of the circumstances indicates that Davie knowingly and intelligently waived his rights to counsel and silence. This determination depends upon "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). In examining whether Davie's waiver was knowing and intelligent, the state appellate court concluded that

> [t]here is no evidence in the record that the police resorted to any physical pressure, coercion or deception to elicit [Davie's] statements. In fact, [Davie] initiated the third interview which led to his confession. There is also no doubt that [Davie] was effectively and adequately apprised of his *Miranda* rights. Moreover, his initials and signature on the forms, his tape recorded statements, and his cooperation during the interviews are evidence that he understood his rights and the consequences of relinquishing them.

*State v. Davie*, No. 92-T-4693, 1995 WL 870019, at *22 (Ohio Ct. App. Dec. 27, 1995). There is no reason to dispute the Ohio appellate court's conclusions here. After Davie initiated contact with Vingle, Vingle brought Davie to an interview room, Vingle re-advised Davie of his *Miranda* rights, and Davie confessed to the crime. Prior to confessing, Davie initialed a constitutional rights form indicating that he understood his rights, and signed the form. During the interview, officers orally read Davie his rights, and Davie remarked that he understood those rights, including the waiver

provision.  Although Davie did not initial the waiver section on the form, Davie explicitly stated that he agreed to speak with the officers, and therefore effectively waived his *Miranda* rights.[2]

In *United States v. Kaufman*, 92 F. App'x 253 (6th Cir. 2004), we held, albeit in an unpublished decision, that there was no *Miranda* violation in a case, like this one, where the defendant had refused to sign a waiver form but freely spoke to police after being advised of his *Miranda* rights.  *Id.* at 256.  We relied in *Kaufman* on the Supreme Court's holding in *North Carolina v. Butler*, 441 U.S. 369, 374-76 (1979), that the Constitution did not require an explicit waiver of *Miranda* rights.  Indeed, the defendant in *Butler* had said to the police, in words that closely prefigure the instant case, "I will talk to you but I am not signing any form."  *Id.* at 371; *see also United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002) (written waiver not necessary to establish knowing, intelligent, and voluntary waiver of *Miranda* rights).

It is no answer to the above analysis to assert that, because Davie repeatedly refused to initial the waiver, he did not think that his statements could be used against him.  Not only did the *Miranda* rights form that officers read to Davie include the obligatory provision that "[a]nything you say can be used against you in court," but Davie repeatedly acknowledged that he understood this provision throughout the morning and afternoon in question, and Davie manifested no objective signs that indicated a misunderstanding.

Further, the law does not require that, where a defendant refuses to sign a waiver but nonetheless agrees to speak with officers, "[i]nvestigating officers should clearly inform the accused that his failure to sign the waiver does not prevent statements he makes from being used against him."  Dissent at 33.  No Supreme Court decision so requires, and lower court cases like *United States v. Van Dusen*, 431 F.2d 1278 (1st Cir. 1970), do not support such a rule.  In that case, the First Circuit, after explaining that a refusal to sign a written waiver followed by a willingness to talk is a "signal of some quirk of reasoning," suggested that a further explanation on the part of the police would have been "prudent."  *Id.* at 1280.  The First Circuit declined, however, to formulate a specific rule to govern police practices, explaining:

> It would, we think, be folly to try to cast this principle in the form of a specific required practice.  Indeed, were we so to rule, a suspect could, by refusing to sign and subsequently talking freely, enjoy the luxury of an immunity bath at no price at all.

---

[2]After officers re-advised Davie of his *Miranda* rights and Davie acknowledged that he understood those rights, the relevant exchange progressed as follows:

> Det. Vingle:  Okay, about 5 minutes to 2 [o'clock], Sgt. Massucci came up from the jail and advised me that you wanted to see me.
> Davie:  Right
> Det. Vingle:  And I came down and you said you wanted to talk to us while we brought you back upstairs, right?
> Davie:  Yea.
> Det. Vingle:  Do you want to acknowledge this that you have been given your rights again? Do you understand this one too [the waiver provision], do you want to initial that one?
> Davie:  It don't matter, do it.
> Det. Sines:  Any particular reason why, you just don't want to initial that part?
> Davie:  Right.
> Det. Sines:  Are you still willing to talk to us?
> Davie:  Right.

*Id.* Thus, rather than adopting a "specific required practice," the *Van Dusen* court chose instead to hold the government to a "measurably increas[ed]" burden of persuasion regarding whether the waiver was knowing and intelligent. *Id.* Indeed, the First Circuit upheld the *Miranda* waiver in that case, even though the police had not even read the *Miranda* warnings, but rather had let the suspect read them to himself. *Id.* Thus, despite the officers' failure to seek clarification from the defendant regarding the refusal to sign the written waiver, the *Van Dusen* court held that the waiver was effective.[3]

In any event, the police officers here cannot be faulted for failing to comply with such a legally unsupportable rule. The officers did *twice* attempt to seek clarification from Davie regarding his refusal to initial the waiver. During the 12:15 p.m interview, the officers questioned Davie as follows:

> Det. Sines: Roderick on this rights sheet that you signed, you acknowledged that you understand your rights there, but you didn't want to uh initial the waiver of rights, okay, is that correct?
>
> Davie: Right.
>
> Det. Sines: Okay being as though you did that do you have any objections to talking to us anyhow?
>
> Davie: No I don't.

JA 2025. Later, at the 2:00 p.m. interview, officers again attempted to seek clarification from Davie:

> Det. Vingle: Do you want to acknowledge this that you have been given your rights again? Do you understand this one too [the waiver provision], do you want to initial that one?
>
> Davie: It don't matter, do it.
>
> Det. Sines: Any particular reason why, you just don't want to initial that part?
>
> Davie: Right.
>
> Det. Sines: Are you still willing to talk to us?
>
> Davie: Right.

JA 2053. Hence, the record establishes that the officers did seek clarification from Davie regarding the apparent incongruity between his refusal to sign the waiver and his willingness to speak. And each time the officers sought clarification, Davie responded unequivocally that he was willing to speak. Accordingly, because Davie reinitiated contact with authorities, and because Davie knowingly and intelligently waived his rights, the confession was admissible.[4]

---

[3] The Ninth Circuit's holding in *United States v. Heldt*, 745 F.2d 1275 (9th Cir. 1984), is also readily distinguishable from Davie's case. The police in *Heldt* "exhorted" the defendant to "answer questions anyway" despite the defendant's desire to remain silent. *Id.* at 1278.

[4] While federal lower court cases like *McGraw v. Holland*, 257 F.3d 513, 518-19 (6th Cir. 2001), indicate that "post-request responses after invocation of [the] right to silence may not be used by the State as a waiver of rights," Dissent at 31, that is not what happened here. In this case, there is no need to infer a waiver from post-request responses because Davie clearly waived his *Miranda* rights before confessing. *See supra* note 2 and accompanying text.

Application of the analysis of the plurality in *Bradshaw* to the facts of this case thus compels the conclusion that Davie's *Miranda* rights were not violated. Justice Powell's concurrence in *Bradshaw*, moreover, which focused on deference to the trial court and on an evaluation of the totality of the circumstances, would a fortiori support the same conclusion. It is true that *Bradshaw* dealt with initiation of questioning after invocation of the right to counsel, and that there was no invocation of the right to counsel in Davie's case. But this distinction if anything cuts against Davie, as asking for counsel requires "additional safeguards" to those where a suspect has, for instance, simply refused to sign a waiver. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (distinguishing *North Carolina v. Butler*, 441 U.S. at 371-76).

**2.**

Moreover, *Michigan v. Mosley*, 423 U.S. 96 (1975), does not undermine the conclusion that Davie effectively waived his *Miranda* rights. The *Mosley* Court *upheld* a confession that followed a cutoff of questioning, and thus it is only by negative inference (i.e., dictum) that *Mosley* can be read to support defendant at all. Although police must respect a suspect's exercise of his right to remain silent, police are not indefinitely prohibited from further interrogation so long as the suspect's right to cut off questioning was "scrupulously honored." *Id.* at 104. The purpose of *Mosley*'s "scrupulously honored" requirement is to safeguard against "repeated rounds of questioning" that can serve to "undermine the will of the person being questioned." *Id.* at 102. As the *Mosley* Court noted, "[t]he requirement that law enforcement authorities must respect a person's exercise of [the option to terminate questioning] counteracts the coercive pressures of the custodial setting." *Id.* at 104. By exercising that option, a person is able to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id.* at 103-04. A review of the record indicates that Davie's right to cut off questioning was fully respected in this case.

In both *Mosley* and this case, the defendant cut off questioning after authorities informed the defendant of his *Miranda* rights and, in both cases, authorities contacted the defendant after an interval of time. *Id.* at 104. In balancing the rights of the defendant and the needs of the authorities, the *Mosley* Court concluded that the authorities did not engage in repeated efforts to wear down the defendant's resistance. *Id.* at 105-06. The same conclusion is mandated here. The record indicates that, while at the police station, authorities attempted to procure a *Miranda* waiver from Davie three times before Davie initiated contact with Vingle and confessed—at 9:05 a.m., 9:59 a.m., and 12:15 p.m. Each time, Davie was properly advised of his *Miranda* rights at the outset of the interview, and each time Davie indicated that he understood those rights. At the 9:05 a.m. interview, Davie indicated that he did not want to make a statement, and the officers made no attempt to question Davie. At the 9:59 a.m. interview, officers entered the room, asked Davie if he knew why he had been arrested, and explained to him that they were investigating a shooting. Davie initially made some comments, but ultimately declined to speak further with the officers. The officers then immediately ceased the interview. At the 12:15 p.m. interview, Davie initially agreed to speak with officers, but refused to sign the waiver of rights. Davie made some statements indicating that he did not remember what happened that morning, and the interview concluded at 12:35 p.m. after Davie stated that he had nothing more to say. One and a half hours later, Davie initiated contact with Vingle and, after again being advised of his rights, confessed to the crime.

---

Moreover, this case is easily distinguishable from *McGraw* and similar lower court cases. For example, in *McGraw*, although the defendant repeatedly indicated a desire to postpone questioning, the police insisted that the defendant discuss the crime, urging that the defendant "need[ed] to tell [the detective] what was happening at the house," and further pressing that "we need to talk about it now," and "[w]e have to talk about it." *McGraw*, 257 F.3d at 515. After police "[r]efus[ed] to take no for an answer," the defendant succumbed and gave a detailed confession. *Id.* at 515-16. The record shows no such pressure here. *See also United States v. Tyler*, 164 F.3d 150, 154-55 (3d Cir. 1998) (police "command[ed]" defendant to "tell the truth" after invocation of right to silence).

In *Mosley*, the defendant confessed during the second interaction with police while at the police station. Here, authorities interacted with Davie three times at the police station before Davie initiated contact with Vingle and confessed. The inquiry under *Mosley*, however, is not restricted to the number of times that the authorities interacted with the defendant. Rather, *Mosley* requires an examination of whether the officers' conduct demonstrates a failure to respect fully the defendant's right to cut off questioning, thereby indicating an "effort[] to wear down [the defendant's] resistance and make him change his mind." *Id.* at 105-06. Although repeated contacts are suggestive of an attempt to undermine a defendant's will, the record does not support a conclusion that the authorities in this case engaged in such an attempt.

First, the interval of time between the interviews was not insubstantial or a short "time out." Officers waited almost one hour between the first and second interaction at the police station, over two hours between the second and third, and one and a half hours had elapsed before Davie requested to speak with Vingle. In total, approximately five and a half hours elapsed between the time that Davie was arrested and the time that Davie contacted Vingle to confess, and authorities read Davie his *Miranda* rights four times during that period. *Cf. Jackson v. Dugger*, 837 F.2d 1469, 1471-72 (11th Cir. 1988) (no constitutional violation where authorities advised defendant of *Miranda* rights six times in a six-hour period between arrest and confession because officers immediately ceased questioning when defendant invoked his right to silence). Further, during each interaction, officers fully informed Davie of his *Miranda* rights at the outset, immediately ceased questioning after Davie expressed his desire to remain silent, *cf. id.*, and there is no evidence in the record that the officers engaged in any other conduct to persuade Davie to change his mind.[5] *Cf. United States v. Olof*, 527 F.2d 752, 753 (9th Cir. 1975) (holding that the object of a successive interrogation was to wear down defendant's resistance when officers reinitiated contact with defendant after three hours by confronting him with the description of the unpleasantness of prison for the obvious purpose of getting him to abandon his self-imposed silence); *United States v. Hernandez*, 574 F.2d 1362, 1368 (5th Cir. 1978) (finding constitutional violation where defendant was held incommunicado for five hours in the "close quarters of a police wagon" before being subjected to repeated and immediate interrogations in a span of 45 minutes). And, making this an even more compelling case than *Mosley*, it was Davie—and not the authorities—who initiated the final contact that led to the confession. In so doing, Davie was unquestionably able to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation," *Mosley*, 423 U.S. at 103-04, regardless of whether Vingle questioned Davie after Davie initiated the contact. For these reasons, it cannot be said that the authorities in this case "undercut" Davie's previous decisions not to answer the officers' inquiries. *See id.* at 105.

Second, *Mosley* does not require that the repeated questioning involve a wholly different crime. As the Eighth Circuit held in *United States v. House*, 939 F.2d 659 (8th Cir. 1991), "a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview." *Id.* at 662. That was one of several factors that the Court considered in its analysis, and there is no indication in *Mosley* that this factor was more central to the Court's analysis than other factors. A leading treatise has indeed noted that, "[i]n *Mosley* the Court observed that the defendant was later questioned about a different crime, but it is unclear how significant this factor was intended to be." *See* 1 Charles Alan Wright & Andrew D. Leipold, *Federal Practice & Procedure: Criminal* § 76, at 226-27 (4th ed. 2008). The other factors the Court considered—which, for the reasons discussed above, indicate that no constitutional violation occurred in this case—include (1) whether police advised the defendant of his *Miranda* rights at the

---

[5]The officer's statement that "If you have nothing to tell us, we'll go from there okay," does not necessarily convey the idea that if Davie did not waive his rights, he would be questioned anyway. *See* Dissent at 32. The statement "we'll go from there" is susceptible of numerous interpretations, and the actual conduct of the officers in this case does not support such a connotation. At each instance that Davie refused to speak further, officers immediately ceased questioning.

first interrogation, (2) whether police immediately ceased the interrogation upon defendant's request, (3) whether police resumed questioning after a significant period of time, and (4) whether police provided new *Miranda* warnings at the successive interviews. As the Fourth Circuit reasoned in *Weeks v. Angelone*, 176 F.3d 249 (4th Cir. 1999), "[w]here other factors indicate that a defendant's right to cut off questioning was 'scrupulously honored,' however, the mere fact that a second interrogation involves the same crime as the first interrogation does not necessarily render a confession derived from the second interrogation unconstitutionally invalid under *Mosley*." *Id.* at 269. Indeed, the "wholly different crime" factor has very limited applicability in cases where, as here, the defendant confessed after reinitiating contact with the officers. To satisfy the first prong of the *Bradshaw* inquiry, the suspect's initiation of contact *must* pertain to the instant investigation. It naturally follows from this that any subsequent interrogation by police will pertain to the same crime. *Mosley* thus cannot be categorically distinguished on the ground that the questioning in *Mosley* involved a different crime.

For the foregoing reasons, the admission of Davie's confession does not warrant habeas relief.

## III.

### A.

Nor do the penalty-phase jury instructions in this case warrant habeas relief. Defendant argues that the "jury was instructed that it must unanimously 'acquit' Roderick Davie of the death penalty before it could consider any of the potential life sentences," and that such an instruction violated Davie's constitutional rights. The Ohio courts largely did not consider this claim, because Davie did not timely raise the claim in state court. The district court likewise held that because Davie first raised the claim in post-conviction proceedings, it was procedurally barred. 291 F. Supp. 2d at 620.

As an initial matter, we agree with the district court that we cannot reach the merits of Davie's substantive "acquittal-first" claim because that claim has been procedurally defaulted. Davie first raised the substantive "acquittal-first" claim in his second petition for post-conviction relief on March 1, 2000. But Davie defaulted on all claims raised in that petition because he did not comply with an adequate and independent state procedural rule. Under Ohio Rev. Code § 2953.23, a second, successive, or untimely petition is permitted under limited circumstances. In Davie's case, the Ohio courts determined that Davie's second petition failed to meet the criteria set out in the statute. *See State v. Davie*, 2001 WL 1647193, at *1-*6 (Ohio Ct. App. Dec. 21, 2001). This court has previously held that where an Ohio defendant is unable to satisfy the statutory requirements to bring a second post-conviction petition, procedural default analysis applies. *See Broom v. Mitchell*, 441 F.3d 392, 399-401 (6th Cir. 2006). Because the claims raised in Davie's second post-conviction petition could have been raised in his first post-conviction petition, those claims are procedurally defaulted absent a showing of cause and prejudice, or a miscarriage of justice. *See id.* at 401.

In his brief to this court, Davie does not attempt to show cause and prejudice for the procedural default with respect to his second petition for post-conviction relief, or otherwise argue that a miscarriage of justice will result from enforcing the procedural bar. Indeed, the record is devoid of any evidence that Davie had cause for failing to raise the claim in his first post-conviction petition. Instead, Davie argues that the "acquittal-first" claim was properly raised in his Ohio Appellate Rule 26(B) application. It is true that the substantive "acquittal-first" claim was included as part of Davie's Rule 26(B) application filed on March 31, 2000. But that application cannot be construed as raising the substantive "acquittal-first" claim.

Rule 26(B) provides that "a defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel." The court must grant an application for reopening if the applicant demonstrates that "there is a genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal." Ohio App. R. 26(B)(5). To determine whether the applicant has raised a genuine issue of ineffective assistance, Ohio courts employ the two-pronged analysis of *Strickland v. Washington*, 466 U.S. 668 (1984). *See State v. Reed*, 660 N.E.2d 456, 458 (Ohio 1996). If the application to reopen is granted, the case proceeds as on initial appeal. Ohio App. R. 26(B)(7).

By its very nature then, a Rule 26(B) application is a claim of ineffective assistance of appellate counsel. Consistent with this view of the Rule, Davie claimed in his Rule 26(B) application that his direct appeal should be reopened because his appellate counsel was ineffective for, among other things, failing to raise the "acquittal-first" jury instruction argument. JA 2768. As this court has previously noted, however, bringing an ineffective assistance claim in state court based on counsel's failure to raise an underlying claim does not preserve the underlying claim for federal habeas review because "the two claims are analytically distinct." *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005). Thus, a Rule 26(B) application "based on ineffective assistance cannot function to preserve" the underlying substantive claim. *Id.*; *see also Roberts v. Carter*, 337 F.3d 609, 615 (6th Cir. 2003) (noting that, "[i]n light of the requirements of Rule 26(B), the court's holding must be read as pertaining to the merits of" the ineffective assistance claim, not the underlying state procedural rule claim).

From this, it follows that Davie's Rule 26(B) application cannot be construed as raising the substantive "acquittal-first" claim. And because the Ohio courts determined that Davie failed to demonstrate a "genuine issue" that his appellate counsel was ineffective for failing to raise that claim, the courts refused to open Davie's direct appeal, thereby imposing a procedural bar to consideration of the claim. As a consequence, Davie's substantive "acquittal-first" claim is procedurally defaulted—Davie failed to bring the claim on direct and collateral review in state court, and the state courts determined that Davie did not make the requisite showing in his Rule 26(B) application to justify reopening his direct appeal. Accordingly, our review in this case is limited to Davie's claim that his counsel was ineffective for failing to raise the "acquittal-first" argument, a claim that *was* adjudicated in the state courts. It is true that if this court were to find that Davie's ineffective assistance claim has merit, that could serve as cause to excuse the procedural default of the substantive "acquittal-first" claim. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). But it is necessary to make that determination prior to excusing the procedural default, and, for the reasons stated in Part III.B. below, Davie cannot establish cause based on the performance of his appellate counsel.

It is true that the analysis above is somewhat complicated by the fact that any review of an ineffective assistance claim will likely include some sort of determination that the substantive claims underlying the ineffective assistance claim lack merit. Indeed, if the underlying substantive claims have no merit, the applicant cannot demonstrate that counsel was ineffective for failing to raise those claims on appeal. Here, the Ohio Court of Appeals dealt with Davie's ineffective assistance claim in just that manner. After remarking that Davie's substantive "acquittal-first" claim would ordinarily be barred by res judicata because Davie challenged the jury instruction on multiple grounds on direct appeal, the Ohio Court of Appeals made clear that Davie's Rule 26(B) application did not assert the underlying substantive claims, but rather asserted a claim that appellate counsel was ineffective for failing to raise those substantive claims. JA 2343. In analyzing whether Davie had raised a "genuine issue" of ineffective assistance, however, the court held that Davie failed to meet his burden because the underlying substantive claims, including the "acquittal-first" claim, had no merit. JA 2348. The Ohio Supreme Court affirmed the judgment of the appellate court on the basis that Davie had failed to raise a "genuine issue" that he was deprived of effective assistance on

direct appeal, and did not address the merits of the "acquittal-first" claim. *See State v. Davie*, 772 N.E.2d 119, 121 (Ohio 2002).

These state court decisions justify review only of Davie's claim that his counsel was ineffective for failing to raise the "acquittal-first" argument on direct appeal. The mere fact that Davie's substantive "acquittal-first" claim was included as an underlying assignment of error in the Rule 26(B) application does not, given the comity and federalism concerns implicated in habeas cases, justify reaching the merits of that claim. Although the determination of whether appellate counsel was ineffective for failing to raise a substantive claim may, in some cases, involve an inquiry into the merits of the underlying substantive claim, the fact remains that the two claims are "analytically distinct" for purposes of the exhaustion and procedural default analysis in habeas review. Reaching the merits of the substantive "acquittal-first" claim in this case disregards the operation of two independent and adequate state procedural rules that barred consideration of that claim in state court. Davie procedurally defaulted the claim in the second post-conviction petition because the requirements of Ohio Rev. Code § 2953.23 were not met. Moreover, he failed to raise the claim properly on direct review, and the Ohio courts refused to excuse this failure when they determined that Davie had not established a "genuine issue" of ineffective assistance of appellate counsel. Because, for the reasons stated below, that ineffective assistance determination was correct, it is not proper for this court to reach the merits of Davie's substantive "acquittal-first" claim.

**B.**

A brief examination of the state of law at the time of Davie's direct appeal indicates that Davie's appellate counsel was not ineffective for failing to raise the "acquittal-first" argument. Because Davie's ineffective assistance claim *was* adjudicated on the merits in state court, AEDPA's deferential standard of review applies to that claim. As with Davie's *Miranda* claim, the proper inquiry here is whether the state court's disposition of the ineffective assistance claim was an unreasonable application of clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). The record indicates that it was not.

By way of background, the trial judge in this case instructed the jury as follows:

> If . . . you're firmly convinced that the aggravating circumstances . . . are sufficient to outweigh the factors in mitigation, then the State has met its burden of proof and the Jury shall recommend to the Court that the sentence of death shall be imposed on the Defendant. . . . If, on the other hand, you're not firmly convinced that the aggravating circumstances . . . are sufficient to outweigh the factors in mitigation, then the State has not met its burden.

JA 1445-46. The trial judge later instructed the jury:

> All 12 jurors must agree on the verdict. If all 12 jurors find by proof beyond a reasonable doubt that the aggravating circumstances . . . outweigh the mitigating factors, then . . . you have no choice but to make a recommendation that the sentence of death be ordered. On the other hand, if . . . you find that the State has failed to *prove* by proof beyond a reasonable doubt, that the aggravating circumstances . . . outweigh the mitigating factors, then you will return a verdict reflecting that decision.

JA 1456-57 (emphasis added).

To understand why Davie's appellate counsel was not ineffective for failing to raise the "acquittal-first" claim, one need only look to the state of the law as it existed at the time of Davie's direct appeal. In *Mills v. Maryland*, 486 U.S. 367, 373-74 (1988), the Supreme Court had held

unconstitutional procedures that required a jury to agree unanimously as to each mitigating factor, reasoning that any such requirement "impermissibly limits jurors' consideration of mitigating evidence." *See McKoy v. North Carolina*, 494 U.S. 433, 444 (1990). Though *Mills* was decided prior to Davie's direct appeal (which took place between 1992 and 1997), it was not until more recently that the *Mills* analysis was applied to jury instructions such as those given in this case.

The "acquittal-first" doctrine derived from *Mills* has been extended to "[a]ny instruction requiring that a jury must first unanimously reject the death penalty before it can consider a life sentence," *see Davis v. Mitchell*, 318 F.3d 682, 689 (6th Cir. 2003), but the *Davis* case in 2003 was the first case in this circuit to apply the doctrine to cases like the instant one, where the instructions did not *explicitly* so instruct the jury. *Id.* at 684-85.[6] In fact, the first case in this circuit to address "acquittal-first" instructions was *Mapes v. Coyle*, 117 F.3d 408 (6th Cir. 1999), a case decided two years after the Ohio Supreme Court decided Davie's direct appeal. Unlike the instructions at issue here, *Mapes* featured instructions that explicitly commanded the jury that "you must *unanimously find* that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty of committing outweigh the mitigating factors." *Id.* at 416 (emphasis added).

It is true that *Mapes* relied on *State v. Brooks*, 661 N.E.2d 1030 (Ohio 1996), an Ohio Supreme Court case decided during the time period between Davie's direct appeal to the state appellate court and his direct appeal to the state supreme court. But *Brooks* also involved an explicit unanimity instruction like the one in *Mapes*, as did other cases discussing "acquittal-first" instructions prior to February 18, 1997, the date on which Davie's direct appeal to the Ohio Supreme Court was submitted. *See id.* at 1040 ("You are now required to determine *unanimously* that the death penalty is inappropriate before you can consider a life sentence.") (emphasis added); *see also Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989) ("If, after your deliberations, you *unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude the imposition of the death sentence, you should sign the form which so indicates."). Thus, even if could be argued that, at the time of Davie's direct appeal, a reasonable counsel should have raised the "acquittal-first" issue based on the *Mapes*, *Brooks*, and *Kubat* cases, the jury instructions in those cases differed significantly from the jury instructions present in this case. *See Davis*, 318 F.3d at 693-97 (Boggs, J., dissenting) (distinguishing the instructions in that case from the instructions in *Brooks* and other cases). Notably, shortly after the *Brooks* decision, the Ohio Supreme Court rejected the contention that the doctrine applied to the non-explicit instructions given in *Davis*. *See State v. Davis*, 666 N.E.2d 1099, 1109 (Ohio 1996) (distinguishing *Brooks*); *see also Henderson v. Collins*, 262 F.3d 615, 622 (6th Cir. 2001) (noting that the Ohio Supreme Court's decision in *Davis* required the challenged instruction to be similar to the acquittal-first instruction struck down in *Brooks* before reversal of a capital sentence is warranted); *cf. Williams v. Coyle*, 260 F.3d 684, 702 (6th Cir. 2001) (rejecting *Mills* challenge to jury instructions similar to those in the instant case). It was not until 2003 that this court, on habeas, found that determination to be error. *See Davis*, 318 F.3d at 684-85.

Thus, given the state of the law existing at the time of Davie's direct appeal, Davie's appellate counsel was not ineffective when he failed to argue that the penalty-phase jury instructions in this case were unconstitutional under the "acquittal-first" doctrine. At the time of Davie's appeal, it simply was not clear that such non-explicit instructions could be considered constitutionally infirm. Accordingly, the performance of Davie's appellate counsel did not fall below an objective standard of reasonableness when counsel failed to raise the claim on direct appeal. Therefore, the state courts' determination of this issue was not an unreasonable application of *Strickland*.

---

[6]And, as discussed in Part III.C., *infra*, even in *Davis*, the jury instructions were more explicit than those at issue in this case. *See* 318 F.3d at 685 ("[Y]ou must find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors.").

## C.

Even if this court could properly ignore the procedural default in this case of Davie's underlying "acquittal-first" claim, that claim still would not warrant habeas relief. The only possible justification for reaching the substantive "acquittal-first" claim would be the fact that the Ohio appellate court actually determined—in the context of adjudicating Davie's ineffective assistance claim—that the underlying substantive claim lacked merit. This necessary reliance on the fact that the state court decided the issue requires inexorably that AEDPA's deferential standard of review be applied to the state appellate court's determination of that claim, which constitutes the last reasoned determination on the issue. *See Payne v. Bell*, 418 F.3d 644, 660-61 (6th Cir. 2005); *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006). And where, as here, the state court "adjudicated the claim but with little analysis on the substantive constitutional issue," *Vasquez v. Jones*, 496 F.3d 564, 569 (6th Cir. 2007), we apply modified AEDPA deference. Under that standard, we conduct "a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570 (quoting *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005)). The proper inquiry here is again whether the state court's disposition of the claim was an unreasonable application of clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

Though the *Mapes* and *Brooks* decisions had been decided by 2001, those cases, as explained, involved explicit unanimity instructions. Reliance on the later extension of those cases in *Davis* is unwarranted, considering that under AEDPA, we must look only to the Supreme Court holdings "as of the time of the relevant state-court decision." *See Williams v. Taylor*, 529 U.S. 362 (2000). See also *Mason v. Mitchell*, 320 F.3d 604, 614 (6th Cir. 2003). At the time of the relevant state court decision in this case (2001), the most that can be said is that it was clearly established federal law, under *Mills*, that instructions like the ones featured in *Brooks* and *Mapes* violated the Constitution. For a state court not to anticipate the holdings of subsequent circuit cases dealing with less explicit instructions can hardly amount to an unreasonable application of clearly established Supreme Court law. This is especially so in light of the contemporaneous cases in this very circuit that approved instructions similar to those in this case. *See Henderson v. Collins*, 262 F.3d 615, 622 (6th Cir. 2001). In an extensive advisory discussion of the case law in this circuit regarding acquittal-first instructions, this court noted that the *Mapes* doctrine was "expanded" in *Davis*, and recognized that certain cases in this circuit questioned the validity of *Mapes* and *Davis*. *See Williams v. Anderson*, 460 F.3d 789, 810, 811 (6th Cir. 2006). Due to the lack of clarity in the law, and due to this court's not yet having expanded the *Mapes* doctrine, the state court's decision in Davie's case appears not to have been an unreasonable one.

Because *Davis* itself was an AEDPA case, however, it is arguably inconsistent with the law of the circuit to hold that a state court reasonably applied Supreme Court law by upholding an instruction identical to the one in *Davis*. But in fact the instruction in Davie's case was considerably less objectionable than the instruction in *Davis*. The pertinent instruction in *Davis* told the jury that "you *must find* that the State" failed to prove that aggravating factors outweigh mitigating factors. *Davis*, 318 F.3d at 685. No such instruction is present in this case. Rather than employing the "you must" language, the trial court in this case stated "[i]f, on the other hand, you're not firmly convinced" that aggravating factors outweigh mitigating factors, "then the State has not met its burden of proof." JA 1445-46. The trial court also later explained that "[o]n the other hand, if after considering all of the evidence . . . you find that the State has failed to prove" that aggravating factors outweigh mitigating factors "then you will return a verdict reflecting that decision." JA 1456-57.

Although *Davis* did not include a *Mapes*-like command that the jury "must unanimously find" that the state failed to prove that the aggravating factors outweighed the mitigating factors, the court found it problematic that the jury was instructed that it "must" find that the government failed

to prove that the aggravating factors outweighed the mitigating factors "immediately" prior to a unanimity instruction that "all 12 of you must be in agreement." *Davis*, 318 F.3d at 689. At Davie's sentencing, the court never instructed the jury that it "must find" that the government failed to prove that the aggravating factors did not outweigh the mitigating factors. Rather, it stated that if "you're not firmly convinced . . . then the State has not met its burden of proof" and "if . . . you find that the State has failed to prove by proof beyond a reasonable doubt, that the aggravating circumstances which the Defendant, Roderick Davie, was found guilty of committing . . . outweigh the mitigating factors, then you will return a verdict reflecting that decision." JA 1445-46, 1456-57.

And while it is true that the trial court had explained that "[a]ll 12 jurors must agree on a verdict" prior to the last of three times this language was used, JA 1456, that explanation took place immediately before the court instructed that the jury must recommend death if it found that the aggravating factors outweighed the mitigating factors. Approximately 70 words separated the unanimity instruction and the acquittal instruction at issue in this case, and these words related to finding that the aggravating factors outweighed the mitigating factors. Thus, if anything, the "12 jurors must agree" language affected the death sentence determination, and not the later instruction regarding mitigating factors outweighing aggravating factors. Therefore, unlike *Davis*, the unanimity instruction here did not take place "immediately" before or after the acquittal instruction or the "in this event" instruction. Consequently, the instruction here did not "improperly imply that only 'in [the] event' of acquittal, which had to be unanimous, could the jurors consider life," *Williams*, 460 F.3d at 812, in the way the instruction was held to do in *Davis*.

*Davis* is therefore not controlling. Under the law of the circuit as it then existed, as well as under subsequent developments, the Ohio courts' disposition of Davie's objection to the jury instructions was not an unreasonable application of Supreme Court law. Thus, even were the substantive "acquittal-first" claim properly before this court, habeas relief would not be warranted.

**IV.**

Davie's prosecutorial misconduct arguments are also without merit. The district court properly analyzed these claims, *see* 291 F. Supp. 2d at 606-607, 617-20, and we adopt its reasoning in that regard.

Davie alleges that during its closing arguments in the guilt phase of the trial, the prosecution improperly denigrated him and his counsel. Setting aside the issue of the procedural default of this claim and of Davie's failure to object at trial to most of the allegedly improper comments, we cannot grant habeas relief on this claim. Not only is the Ohio Supreme Court's rejection of this claim neither an unreasonable application of nor contrary to federal law, *see* 686 N.E.2d at 263, but we agree with the district court that, even were we to review this claim independently, we would not find that the comments in question rendered Davie's trial fundamentally unfair. *See* 291 F. Supp. 2d at 607.

Likewise, Davie's contention that the prosecution improperly commented on the failure of a defense expert to testify does not merit relief. Without even considering procedural default, Davie still makes no showing that the Ohio Supreme Court's rejection of this claim was an unreasonable application of federal law, *see* 686 N.E.2d at 264, and the comments did not render the trial fundamentally unfair. *See* 291 F. Supp. 2d at 607.

Finally, Davie argues that certain statements in the prosecution's penalty-phase closing argument were improper. We again agree with the district court that, even if this claim is not defaulted, the Ohio Supreme Court did not unreasonably apply federal law in rejecting this claim, *see* 686 N.E.2d at 263, and we would independently conclude that "[e]ven if all the statements were improper, they did not so infect the trial" with unfairness as "to make the resulting conviction a denial of due process." 291 F. Supp. 2d at 619-20.

Davie's prosecutorial misconduct claims do not warrant habeas relief.

## V.

For the foregoing reasons, we affirm the judgment of the district court.

---

**CONCURRENCE**

---

R. GUY COLE, JR., Circuit Judge, concurring.

**I.**

The Supreme Court has noted that:

> [e]xpanded concepts of fairness in obtaining confessions have been accompanied by a correspondingly greater complexity in determining whether an accused's will has been overborne[—]facts are frequently disputed, questions of credibility are often crucial, and inferences to be drawn from established facts are often determinative. The overall determination of the voluntariness of a confession has thus become an exceedingly sensitive task, one that requires facing the issue squarely, in illuminating isolation and unbeclouded by other issues and the effect of extraneous but prejudicial evidence.

*Jackson v. Denno*, 378 U.S. 368, 390-91 (1964) (internal citations omitted).  This case, which turns on the facts surrounding Davie's confession, is a perfect example of this complexity.  After much deliberation, I concur in the lead opinion's conclusion that Davie's appeal does not warrant habeas relief.

**II. BACKGROUND**

Because Davie filed his habeas petition after the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, we review his claims to determine whether the "state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000).  In so doing, we rely on the Ohio Supreme Court's determination of the facts as set forth in *State v. Davie*, 686 N.E.2d 245 (Ohio 1997).  Further, we apply AEDPA deference to the state courts' determinations regarding the merits of the claim, but we review de novo all issues not reached by the state courts. *Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006).

Given the long procedural history of this case and the thorough factual background set forth in the 1997 Ohio Supreme Court opinion, I will not rehash the details of Davie's crimes, but the relevant facts surrounding Davie's confession follow.

**A. Davie's Confession**

*1. 8:30 a.m. - The Arrest*

At 8:30 a.m. on the day of the VCA murders, the Warren Municipal Court chief bailiff, Carl Miller,  received a phone call from Dwayne "Styx" Thomas, an informant who identified Davie as the individual responsible for the crimes.  Miller and the Warren Police Captain, Timothy Downs, proceeded to the address Styx had given them, where they arrested Davie and advised him of his *Miranda* rights. Davie acknowledged his understanding of the rights, but he refused to sign a waiver of those rights.

### 2. 9:05 a.m. - The Initial Questioning

Upon arriving at the police station at approximately 9:05 a.m., Captain Downs placed Davie in an interrogation room and asked Lt. Carl Blevins to question him. Blevins and Detective Morris Hill entered the interrogation room and re-read Davie his *Miranda* rights. The officers showed him a written form presenting those rights. Davie initialed the form on each line, indicating he understood his rights, but, again, refused to sign the waiver. At that point, the officers performed an atomic absorption test on Davie's hands, but they did not question him further. Davie neither requested an attorney nor invoked his right to remain silent.

### 3. 9:59 a.m. - The Second Interrogation

At 9:59 a.m., Downs and Blevins re-entered the interrogation room, informed Davie that they would be recording the interview, and read Davie his *Miranda* rights again. For a third time, Davie indicated that he understood his rights. This time, however, he informed the officers that he did not want to make a statement:

Blevins:     Do you not wish to make a statement or anything at this time.

Davie:       Doesn't matter to me.

Blevins:     I heard you refuse.

Davie:       I didn't refuse[;] you said I didn't have to if I didn't want to.

Blevins:     Do you wish to make a statement yes or no.

Davie:       No statement.

Blevins:     You wish not to make a statement.

Davie:       Right.

Blevins.     Okay that's fine . . . this interview is now completed . . . .

(Joint Appendix ("JA") 2018-20, partial transcript of taped interview with Davie at 9:59 on June 27, 1991.) At that point, the officers ended the interview and transported Davie to a jail cell. Davie never asked to speak to an attorney.

Shortly after the officers had finished the second interrogation, Detective Sines called the Trumbull County Prosecutor, Dennis Watkins, to ask him for his legal advice on how the officers could proceed in questioning Davie, if at all. The prosecutor advised Sines that "as long as Davie did not refuse to speak and did not demand an attorney, the officers could talk to him, provided that Davie acknowledged that he understood his rights." *Davie*, 686 N.E.2d at 256.

### 4. 12:15 p.m. - The Third Interrogation

Given Watkins's advice, at approximately 12:15 p.m., Detective Sines and Detective Sergeant Gary Vingle requested that Davie be brought from his jail cell for interrogation. Davie agreed to talk to the officers and was escorted to the interrogation room. There, the officers re-advised him of his *Miranda* rights and told him that the interview would be recorded. Davie again initialed each sentence of the constitutional rights form except for the waiver of rights and indicated that he understood. As before, Davie did not request a lawyer and willingly spoke to the detectives.

The following exchange then occurred:

Sines:          Do you want to sign your name here that you understand that?

Davie:          Well I'm not signing the waiver of rights. I didn't sign it earlier.

Sines:          Okay, okay. You can take it, go ahead. He didn't sign it.

Vingle:         Would you be willing to answer some of our questions if we ask you some, you know you [sic]?

Davie:          Yes.

(JA 2021.) As the officers proceeded with the interview, Davie told them that although he did not remember being around the VCA that morning, he remembered having his gun with him. He then described the gun and informed them that he always carried one. When, at about 12:35 p.m., Davie told the officers he could not remember anything else about the incident and no longer wished to speak with them, the officers terminated the interview and Davie was returned to his jail cell.

### 5. 2:00 p.m. - The Confession

At 2:00 p.m. that same afternoon, Sergeant Massucci went to the cell to take photographs of Davie. Davie asked Massucci if he could make a phone call, and Massucci granted his request. Davie called his girlfriend, Sonya Barnes, who apparently told him that she and Davie were being discussed in the local media. When Davie went back to his cell, he told Massucci that he wanted to talk to Vingle to discuss what was being released to the media and to determine what information Styx had given the police that morning.

Davie was subsequently brought from his cell to the interrogation room where Vingle and Sines re-advised him of his *Miranda* rights. For a third time, Davie initialed a constitutional rights form provided by the officers, indicating that he understood his rights, and signed the form. Although Davie once again refused to sign the waiver, he explicitly stated that he agreed to talk to the officers, and he did not ask to speak to an attorney.

Vingle:         Do you want to acknowledge this that you have been given your rights again? Do you understand this one too, do you want to initial that one?

Davie:          It don't matter, do it.

Sines:          Any particular reason why, you just don't want to initial that part?

Davie:          Right.

Sines:          Are you still willing to talk to us?

Davie:          Right.

Sines:          Okay.

Vingle:         Okay, this has been building up?

Davie:          I don't know, I just flipped out this morning.

Vingle:         Tell us what happened, tell us.

Davie:        I mean, it's evident what happened.

Sines:        We have an idea what happened but we would like to hear from you
              what happened, just to verify what we got.

Davie:        I went down to the VCA and shot 'em up.

(JA at 866-67.)  Davie then asked the officers to type up his statement because he did not want to have to confess again.  Once the tape was transcribed, Davie signed or initialed each page of the transcript.

On a motion to suppress filed by Davie's appointed counsel, the trial court found Davie's 2:00 p.m. confession to be admissible.  The court reasoned that despite Davie's failure to initial the waiver-of-rights portion of the form, he had impliedly waived his right to remain silent during both the 12:15 p.m. and the 2:00 p.m. interrogations, and that Davie had initiated the 2:00 p.m. interrogation that ultimately led to his confession.  *Davie*, 686 N.E.2d at 256-57.

### III. ANALYSIS

Despite some misgivings surrounding the somewhat questionable police conduct at issue in the case, I join in the lead opinion's conclusion that the trial court did not err in admitting Davie's confession.  Though the officers questioned Davie four separate times over the course of approximately six hours, the trial court correctly determined that they respected Davie's rights under *Miranda*, *Mosley*, *Edwards*, and their progeny.  Further, I agree with the lead opinion's conclusion that Davie himself initiated the 2:00 p.m. interrogation during which he ultimately confessed.

### A. Voluntariness

The test for the voluntariness of a defendant's confession is whether, under the totality of the circumstances, the government obtained a statement by coercion or improper inducement.  *Haynes v. Washington*, 373 U.S. 503 (1963).  A factual inquiry into the voluntariness of the statement should focus on the conduct of the law enforcement officers involved.  *Mincey v. Arizona*, 437 U.S. 385 (1978).

In *Michigan v. Mosley*, 423 U.S. 96, 104 (1975), the Supreme Court clarified that the admissibility of statements obtained after a person in custody decides to remain silent depends on whether the police "scrupulously honored" his right to cut off questioning should they renew interrogation.  *Mosley* requires an examination of whether the officers' conduct demonstrates a failure to respect the defendant's right to end questioning, thereby indicating an "effort [] to wear down [the defendant's] resistance and make him change his mind," *id*. at 105-06, and prescribes several factors relevant to the determination: (1) the amount of time that lapsed between interrogations; (2) the scope of the second interrogation; (3) whether new *Miranda* warnings were given; and (4) the degree to which police officers pursued further interrogation once the suspect invoked his right to silence.  *Id*.  Although these factors are not intended to be a per se test, courts use them in considering whether, in the totality of the circumstances, admission of a defendant's incriminating statements violates *Miranda*. *Id*. at 103-05.  In *Edwards v. Arizona*, 451 U.S. 477, 485 (1984), the Supreme Court added another aspect to the analysis, holding that if an accused requests counsel, the police must cease all questioning "unless the accused himself initiates further communication, exchanges or conversations with [them]."

Viewing the facts through the lens of the *Mosley* factors, I agree that the officers questioning Davie honored his right to remain silent.  The police re-*Mirandized* Davie before each of the four interrogations, including the interrogation in which Davie ultimately confessed.  Moreover, during the 9:05 a.m., 12:15 p.m. and 2:00 p.m. interrogations, Davie initialed and signed a form indicating

that he understood his rights. Further, Davie never asked for an attorney, and the transcripts demonstrate that the police stopped questioning him when he refused to make a statement.

Though the dissent argues that the officers did not wait long enough between their interrogations, I find that the timing was not unreasonable under the circumstances.[1] Although only about five hours passed between the first, second, and third interrogations, "[t]he courts have generally rejected a per se rule as to when a suspect must be re[-]advised of his rights after the passage of time or a change in questioners . . . . In fact, a number of circuits have ruled that re-warning is not required simply because time has elapsed." *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997); *Evans v. McCotter*, 790 F.2d 1232, 1237-38 (5th Cir. 1986) (defendant voluntarily waived his rights where he was twice advised of his rights over the course of a three-hour period, notwithstanding a change in interview locations). Where the officers consistently read Davie his rights prior to interrogating him and in all instances, respected Davie's request to end the questioning, the officers were not acting outside the bounds of what have been deemed appropriate methods of interrogation. Further, Davie's case is wholly incomparable to the types of extreme physical and psychological coercion suffered by other defendants. *Compare Beecher v. Alabama*, 389 U.S. 35, 38 (1967) (holding confession to be involuntary where officers already having wounded the defendant, ordered defendant at gunpoint to confess or be killed), *Davis v. North Carolina*, 384 U.S. 737, 745-47 (1966) (confession found involuntary where officers interrogated the defendant over sixteen days and held him incommunicado in a closed cell without windows and with limited food), and *United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (confession coerced when officers told suspect he could either have an attorney present during questioning or cooperate with the government).

The fact that the officers focused each of their interrogations on the issue of what occurred at the VCA does not change my analysis because "a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview." *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991); *see also Hatley v. Lockhart*, 990 F.2d 774 (8th Cir.1993) (the fact that a second interrogation of defendant involved the same subject matter as the first did not violate defendant's rights where there was no effort to wear down the resistance, and the police had not re-contacted him with the sole purpose of trying to induce him to abandon his earlier silence); *United States v. Hsu*, 852 F.2d 407, 412 (9th Cir. 1988) (questioning defendant about the same crime does not of itself prove bad faith or undue pressure on the part of the police); *but see Charles v. Smith*, 894 F.2d 718, 726 (5th Cir. 1990) (*Mosley* violated where same officer questioned defendant about same crime "just a few minutes after" he had invoked his right to silence). Moreover, as to the actual confession, a defendant can waive an invocation of his earlier right to remain silent by subsequently making a voluntary statement to the police. *See, e.g.*, *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979) (waiver may be inferred from particular facts and circumstances surrounding the case); *United States v. Kaufman*, 92 Fed. App'x 253, 255-56 (6th Cir. 2004) (no *Miranda* violation where defendant refused to sign a waiver form but freely spoke to the police after being advised of his *Miranda* rights); *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002) (written waiver unnecessary to establish knowing, intelligent and voluntary waiver of *Miranda* rights); *Henderson v. Singletary*, 968 F.2d 1070, 1073-74 (11th Cir. 1992) (finding that officer's three separate attempts to clarify whether a defendant intended to cut off questioning did not violate the defendant's constitutional rights).

---

[1] I believe that the short passage of time between the 9:05 a.m. and the 9:59 a.m. interrogations is counter-balanced by the fact that the officers re-read Davie his *Miranda* rights and immediately ended the interrogations following Davie's requests. Moreover, other courts have found the passage of even *shorter* periods to have been reasonable in the face of the other *Mosley* factors. *See United States ex rel. Patton v. Theiret*, 791 F.2d 543, 547-48 (7th Cir. 1986) (finding that the passage of forty minutes does not require that the police re-*Mirandize* defendant); *Mills v. Commonwealth of Kentucky*, 996 S.W.2d 473, 480-83 (Ky. 1999) (10-20 minute interval between interrogations "concerned" the court, but was found long enough under the circumstances).

Finally, Davie's personal characteristics—including his age, education, intelligence, and prior experience with the police—all point to a voluntary confession. *See Jackson v. McKee*, 525 F.3d 430, 434 (6th Cir. 2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Davie grew up in a relatively stable and supportive home environment, attended school until his expulsion at age sixteen, and, though he has some cognitive and psychological problems, he was unaffected by any severe mental deficiencies. *Davie*, 686 N.E.2d at 265-66.

It is notable, moreover, that Sines contacted the county prosecutor to ensure that his questioning of Davie was within the bounds of the law. I do not share the dissent's view that the phone call to the prosecutor evidences an effort by Sines to ignore Davie's refusal to waive his rights in order to continue the interrogation. On the contrary, I view the call as an indication that Sines was conscious of not overstepping Davie's rights by continuing to question Davie after his refusals to waive his rights during the first and second interrogations. Sines clearly knew that a thin line exists between proper questioning of defendants and coercive tactics, and I believe, absent evidence to the contrary, that he was taking steps to guarantee that he did not cross that line.

## B. Initiation

Davie's assertion that his statements were involuntary is further undermined by the fact that *he*—not the officers—initiated the 2:00 p.m. encounter during which he ultimately confessed. This Court has determined that "initiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case." *United States v. Whaley*, 13 F.3d 963, 966-67 (6th Cir. 1994) (citing *Oregon v. Bradshaw*, 462 U.S. 1039 (1983) (holding that a defendant can negate his earlier invocation of his *Miranda* rights by initiating a conversation)). Moreover, some courts have found that the requirement that a "significant period" of time pass between a defendant's invocation of his right to silence and a second round of questioning is not applicable to a situation in which the police discontinue questioning and the defendant subsequently initiates a confession. *See, e.g., Henderson*, 968 F.2d at 1071 ("It does not make sense to apply the same time standard to situations in which the defendant controls the time period between the end of police questioning and the start of a defendant-initiated confession."); *United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006) (*Mosley* time limits inapplicable "if the suspect, and not the police, reinitiates contact and agrees to questioning").

The facts suggest that Vingle interrogated Davie at 2:00 p.m. because Davie wanted to talk. Around 2:00 p.m., when Massucci was photographing Davie in his cell, Davie asked Massucci if he could make a phone call, a request Massucci granted. In talking to Barnes, Davie apparently learned that the media was covering the morning's events occurring at the VCA, and at that point, he requested to meet with Vingle. Vingle complied, the officers re-*Mirandized* Davie, and Davie confessed. Nothing about this encounter leads me to conclude that the police broke Davie's will to force his ultimate confession.

## C. Conclusion

The principle that a person's rights are violated when police coerce an involuntary confession from him, truthful or otherwise, through physical or psychological methods designed to overbear his will is fundamental to our justice system. *See Blackburn v. Alabama,* 361 U.S. 199, 206 (1960) ("coercion can be mental as well as physical . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition"). Based on this principle, the Supreme Court has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment. *See Brown v. Mississippi,* 297 U.S. 278, 286-87 (1936). Though the police's continual questioning of Davie may toe the line of what is reasonable behavior by law enforcement, I agree that the trial court's decision

to admit his confession at trial was reasonable under the circumstances and find that an affirmance of the district court's denial of habeas is appropriate here.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting. The majority in this case is reading the AEDPA statute unlawfully to suspend the writ of habeas corpus in violation of the Suspension Clause of the United States Constitution, Article I, § 9 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). Here, as I shall explain below, the majority is using the AEDPA statute as a license to overrule *Miranda v. Arizona* and its lineal progeny developed by the Warren-Brennan Court four decades ago to outlaw coerced confessions that abridge the Sixth Amendment right to counsel and the Fifth Amendment right against self-incrimination. The capital defendant invoked both his right to silence and counsel to no avail before he was then enticed to confess.

## I. Summary

Police officers on June 27, 1991, confronted petitioner Roderick Davie *six times* within a 5-1/2 hour period between his arrest at 8:30 A.M. that morning and his confession around 2:00 P.M. that afternoon. At none of these confrontations was he willing to sign a waiver of his rights to silence and a lawyer. The time between the confrontation was in sequence 30 minutes, 45 minutes, 2 hours and 2 hours. At the first confrontation, when he was arrested, Davie was given his *Miranda* warnings but he did not confess. At the second confrontation at 9:05 A.M., Davie was again informed of his rights and asked to sign a waiver form. He refused, saying he "didn't want to" waive his right to remain silent and his right to the assistance of a lawyer.[1] At 9:59 A.M., police confronted Davie a third time and informed him of these rights yet again, to which he declined again to sign the waiver form and stated unequivocally that he did not "wish to make a statement." Two hours later, at 12:15 P.M., a new team of police interrogators confronted Davie a fourth time and read him his *Miranda* rights. He again exercised his right to silence and counsel by refusing to sign the waiver form, after which he was asked a number of questions to which he finally answered that he had "nothing to tell" the police. The fifth confrontation occurred 1-1/2 hours later when police sent a detective as a photographer to take pictures of Davie *in his cell* (rather than at the booking desk). A conversation ensued between the detective and Davie, and Davie asked if he could talk to a police officer. The sixth confrontation immediately followed in which Davie again refused to sign the waiver form but asked the officer how the news media had obtained particular information. Davie initiated the conversation only to ask a question. Instead of answering Davie's questions, the officer turned the question around and began to interrogate Davie again. In answer to this interrogation at the sixth encounter, Davie then briefly confessed to the murders ("I went there and shot them up."). At that time, the officer again advised Davie of his *Miranda* rights and Davie gave a full, detailed, taped confession. The consistent, express refusal each time to sign the waiver of these two fundamental rights at the request of the police officers should have put the officers on notice that their persistent requests for a formal, pen-to-paper relinquishment of these rights would

---

[1]The waiver of rights form that Davie refused to sign stated:

> I have read this statement of my Constitutional Rights and understand what my rights are. I am willing to make a statement and answer questions. I do not want a Lawyer at this time. I understand and know what I an [sic] doing. No promises or threats have been used against me. I therefore waive my rights and agree to make a statement.

Davie signed each constitutional right as the police officer read it to him, thereby indicating that he understood the right; but he refused to sign the wavier while stating verbally that he would not waive those rights, thereby conveying the message to the police that he understood his rights and was exercising his rights by refusing to waive them. He thus refused by these actions to waive his right to remain silent and his right to the assistance of a lawyer.

cause a reasonable person to believe that his signature was necessary in order to make a "knowing and intelligent waiver of fundamental rights," as required by *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938) (in order for a constitutional right to be "properly waived" the accused must act "competently and intelligently").

The jury returned a death verdict on March 19, 1992, which was upheld on direct appeal on December 27, 1995, in an unreported opinion by the Ohio Court of Appeals and then by the Ohio Supreme Court on November 26, 1997, *State of Ohio v. Davie*, 80 Ohio St. 3d 311, 686 N.E.2d 245. The Ohio Supreme Court held the confession admissible because Davie's earlier multiple exercises of his right to remain silent "did not preclude a later interrogation by other officers" within two hours because Davie "initiated the conversation himself." 686 N.E.2d at 257. In the fifth confrontation, Davie had only asked a question of the police photographer who was sent to his cell and then of another officer in the sixth encounter that immediately followed. The police did not "scrupulously honor" his previous exercise of his rights when they again began to ask him questions rather than simply reply to his question. Such police conduct violated the *Miranda* standard against "persisting in repeated efforts to wear down resistance and make him change his mind," after exercising his Fifth and Sixth Amendment rights by refusing to execute the waiver form four times since 8:30 A.M. that morning and expressly stating three times that he did not want to give a statement.

## II. The Facts Respecting the Interrogations and the Confession

Petitioner Roderick Davie was employed by Veterinary Companies of America, a pet food and supplies distributor in Warren, Ohio, as a warehouse worker until he was fired in April of 1991. On the morning of June 27, 1991, Davie arrived at the company warehouse and within minutes shot William Everett and John Coleman, two truck drivers with the company, and assaulted Tracey Jefferys, a secretary at the company. Coleman and Jefferys died at the scene, but Everett survived despite being shot multiple times.

Around 8:30 A.M. that morning, authorities received a phone call from Dwayne Thomas, known as "Styx," indicating that he had information about the murders at the Veterinary Companies of America. Thomas, known as an informant to local authorities, indicated that he was with the perpetrator, Davie. The police found Davie at home, where he was first advised of his *Miranda* rights but did not waive those rights. He was arrested and brought directly to an interview at the police station for interrogation.

A few minutes later, at about 9:05 A.M., Lieutenant Blevins and Detective Hill read Davie his rights and gave him a Warren Police Department form with the heading "YOUR CONSTITUTIONAL RIGHTS" at the top followed by the standard *Miranda* warning broken down line-by-line with space to initial that he understood each right. The section labeled "WAIVER OF RIGHTS" states:

> I have read this statement of my Constitutional Rights, and understand what my rights are. I am willing to make a statement and answer questions. I do not want a Lawyer at this time. I understand and know what I an [sic] doing. No promises of threats have been used against me. I, therefore, waive my rights and agree to make a statement.

(J.A. at 2017.) Davie initialed the lines on the standard form saying he understood his rights. He refused to initial the waiver portion of the form and told Blevins and Hill "he didn't want to" sign the form or talk. (J.A. at 688. Testimony of Lt. Blevins.) An officer wrote on the form that Davie "Refused to sign" the form. (J.A. at 2017.) The record does not indicate who wrote it. Lieutenant Blevins performed an atomic absorption analysis on Davie's hands looking for the presence of

gunpowder. The officers did not attempt to question Davie further but told him they would return later to question him about the same crime.

At 9:59 A.M., less than an hour later, Blevins and Hill confronted Davie a third time in the interview room to question him about the murders. They informed Davie that they were going to record the interview. They again read Davie his rights and asked him if he understood them. He replied yes. Despite Davie's refusal to waive his rights, the officers began to question him, first asking him if he knew why he was "down here." Davie answered no. Nevertheless, as if he had never asserted his *Miranda* rights, the officers told him that they were investigating a shooting on Main Street that occurred earlier that morning and asked him if he had any knowledge of it. Davie responded that he remembered "some things," including that he "had a gun earlier."

Blevins then acknowledged on the tape that he was aware that Davie had not waived his rights. But the following exchange occurred:

| Blevins: | Do you not wish to make a statement or anything at this time. |
| Davie: | Doesn't matter to me. |
| Blevins: | I heard you refuse. |
| Davie: | I didn't refuse you said I didn't have to if I didn't want to. |
| Blevins: | [D]o you wish to make a statement yes or no. |
| Davie: | No statement. |
| Blevins: | You wish not to make a statement. |
| Davie: | Right. |
| Blevins: | Okay that's fine . . . this interview is now completed . . . . |

(J.A. at 2018-20, partial transcript of taped interview with Davie at 9:59 on June 27, 1991.)

At the suppression hearing Blevins testified that when he returned to the interview room at 9:59 A.M., he had "forgotten" that Davie refused to waive his rights less than an hour earlier. (J.A. at 717.) Blevins' testimony was unequivocal: "If [Davie] wasn't going to initial it [the waiver portion of the form], then I wasn't going to talk to him. . . . I believe that he should initial that . . . to give a statement." When asked if he believed he had to have an express waiver, he answered, "That's correct." (J.A. at 697, 724-25.) The trial court suppressed the statements made by Davie at the 9:59 interview.

At the suppression hearing, Blevins also testified that at the conclusion of the 9:59 A.M. interview, he conferred with Detective Sines about Davie's failure to sign the waiver portion of the form. Blevins did not play the tape for Sines, but Blevins specifically and unequivocally testified that he told Sines that the interview was terminated because Davie refused to sign the waiver of rights *and because Davie expressly stated that he did not wish to make a statement.* (J.A. at 726.) After the 9:59 A.M. interview, the first team of investigators ceased interacting with Davie, having never obtained a confession or waiver. Detective Sines then replaced Blevins and Hill and commenced a fourth effort to get Davie to confess.

Detective Sines testified at the suppression hearing that Lieutenant Blevins and Detective Hill informed him that Davie refused to initial the waiver portion of the form. Contrary to Blevins' clear testimony that Blevins explicitly told Sines that Davie had expressly refused to talk, Sines testified that he "did not remember" hearing that Davie had expressly stated that he did not want to make a statement. Sines also testified that he made no effort to review the tape of the 9:59 A.M. interview. (J.A. at 790.)

Detective Sines testified that he called Trumball County Prosecutor Dennis Watkins for advice about how to get Davie to talk to the police. Sines testified that he was not "aware" that

Davie had said at the 9:59 A.M. interview that he did not want to make a statement, and so Sines did not tell the prosecutor that Davie had stated a few minutes earlier that he did not want to talk. Sines testified that "[Watkins'] advice to me was as long as he [Davie] did not demand an attorney present at the time, and as long as he acknowledged that he understands his Constitutional rights, that he could talk with him, as long as he volunteered or would talk with us." (J.A. at 740.) Despite Davie's refusal to waive his right to a lawyer and his declaration to the police that he did not want to talk, Sines interpreted this advice as allowing the police to interrogate Davie once again. (J.A. at 793.)

Detective Sines, accompanied by Detective Vingle, then went down to the jail area about 12:15 P.M. for a fourth interrogation of Davie. Again, both Sines and Vingle denied that they knew that Davie had verbally refused to make a statement at the 9:59 A.M. interview, and they acknowledged that they had not reviewed the tape from that interview. (J.A. at 871.) They testified that they only knew Davie had refused to sign the waiver portion of the form. Consequently, two hours after Davie first refused to waive the assistance of counsel or talk, the police again proceeded to interrogate Davie. Davie, who agreed to the officer's request that he speak with them, was advised that the interview was going to be taped. The 12:15 P.M. interview started with Sines saying, "I'm Detective Sines and Detective Vingle and we will advise you of your rights, we want to talk to you a little bit. If you have something to tell us, we'll listen to you. If you have nothing to tell us then we'll go from there okay." Vingle says, "Okay Rod before we ask you any questions you might understand your rights. Do you understand that right?" Although it is not clear what "right" Vingle was referring to, Davie answered "Yes." Vingle then proceeded to read the entire *Miranda* warning and the waiver portion of the form aloud. Davie indicated that he understood both. The officers did not inform Davie that if he did not want to talk the interview would cease; instead they said, "If you have nothing to tell us then we'll go from there okay." They showed Davie a new copy of the Warren Police Department form with the waiver of constitutional rights that Davie had previously declined to sign. The form is timed at 12:15 P.M. and signed by Officers Vingle and Sines. (J.A. at 2021.) The following exchange occurred:

| | |
|---|---|
| Sines: | Do you want to sign your name here that you understand that? |
| Davie: | *Well, I'm not signing the waiver of rights. I didn't sign it earlier.* |
| Sines: | Okay, okay. You can take it, go ahead. He didn't sign it. |
| Vingle: | Would you be willing to agree to answer some of our questions if we ask you some, you know you? |
| Davie: | Yes. |

Detective Vingle proceeded to ask Davie general questions about his employment history, before returning to the issue of the waiver.

| | |
|---|---|
| Sines: | Roderick on this rights sheet that you signed, you acknowledged that you understood your rights there, but you didn't want to uh initial the waiver of rights, okay, is that correct? |
| Davie: | Right. |
| Sines: | Okay being as though you did that do you have any objections to talking to us anyhow. |
| Davie: | No I don't. |

Sines then asked what happened at the Veterinary Companies of America that morning. Davie responded "I don't remember anything." Davie, in response to further questioning, stated that he did not remember being at the Veterinary Companies of America that morning, but that he knew he had his gun with him that morning. He described the gun and said that he always carried his gun. After more conversation and offers to get him a soft drink and a cigarette, the officers asked Davie about a gun that Sines had with him. Davie stated, "Just like I told you, I don't remember anything.

I remember waking up this morning and everything is a blank." When asked if he remembered being at the Veterinary Companies of America that morning, Davie again responded, "No I don't. If I was it's a total blank to me."

The tape was turned off for three minutes at 12:27 P.M. Both Vingle and Sines testified that they left the room, but neither could remember what they talked about outside the room. The officers then returned and resumed the questioning.

Sines:      Okay, one, one more time, this is for the record Roderick, um, you don't remember anything after you got up and watched t.v. until Carl [Blevins] came [to arrest you]?
Davie:      No I don't.
Sines:      You don't have nothing else to say about what we're talking about? I'm in the blue about the picture.
Davie:      I mean I can't really, you know tell you anything now I don't know anything about.
Sines:      Okay, okay you have nothing to tell us at this time about what we're asking you about?
Davie:      No.

Sines concluded the interview at 12:35 P.M. The above statement was admitted at Davie's capital trial.

At 2:00 P.M., another encounter began when Detective Massucci was sent to take pictures of Davie in his cell. Davie asked if he could make a phone call. Massucci said yes, and when Davie returned he told Massucci he wanted to talk to Detective Vingle. Massucci found Vingle and told him Davie wanted to see him. Vingle went down to the jail, and took Davie into the jailer's room to ask him what he wanted. Vingle testified that Davie wanted to know how the news media got so much information about him and his girlfriend. Vingle said he had no control over what the news media gathered. Then Davie asked him "What did Styx tell you?" Instead of answering, Vingle asked, "What did you tell Styx?" Davie replied, "I went there and shot them up." Vingle testified that he then told Davie that they needed to go upstairs to the interrogation room, where Davie would be formally advised of his rights again. Davie agreed, and Vingle took him upstairs. (J.A. at 866-67.) The following exchange occurred:

Sines:      Roderick I understand you want to talk to us some more.
Davie:      There's not much to talk about. I mean, I done it.
Vingle:     Well, wait a minute, before we get into that Roderick I'm going to readvise you, okay.
Davie:      I can understand all that.
[Davie is readvised of his rights and states that he understands his rights. Vingle then reads the waiver portion of the form and asks Davie if he understands that. Davie answers "Right."]
Vingle:     Do you want to acknowledge this that you have been given your rights again? Do you understand this one too, do you want to initial that one?
Davie:      It don't matter, do it.
Sines:      Any particular reason why, you just don't want to initial that part?
Davie:      Right.
Sines:      Are you still willing to talk to us?
Davie:      Right.
Sines:      Okay.
Vingle:     Okay, this has been building up?
Davie:      I don't know, I just flipped out this morning.

Vingle:     Tell us what happened, tell us.
Davie:      I mean, it's evident what happened.
Sines:      We have an idea what happened but we would like to hear it from
            you what happened, just to verify what we got.
Davie:      I went down to the VCA and shot 'em up.

Davie then proceeded to talk more about the murders and what he did after he left the scene. After about 15 minutes, Davie refused to talk further. He told the officers to type up his statement off the tape because he did not want to go through the confession again. (J.A. at 2074.) After the tape was transcribed, Davie signed or initialed each page of the transcribed statement at the bottom. (J.A. at 2052-2062.) Davie's initials acknowledged that he understood his constitutional rights, but he once again refused to sign or initial the waiver portion of the form regarding his right to a lawyer and to remain silent. (J.A. at 2051.)

Davie's counsel, appointed afterward, moved to suppress all the statements he made to police. The trial court held that there were no statements to suppress from the encounters at 8:30 A.M. or 9:05 A.M. and that the statement given at 9:59 A.M. must be suppressed because the government had not shown that Davie waived his right to remain silent. The statements from the 12:15 P.M. and 2:00 P.M. interviews were admitted because the trial court found that Davie had waived his rights by asking Vingle the question about "Styx." The two confessions were admitted, and Davie was convicted and received the death penalty. The District Court simply concluded that the Ohio Supreme Court did not apply Supreme Court law in a way that was either "contrary to, or an unreasonable application of, clearly established Federal law." 291 F. Supp. at 597.

### III.  The *Miranda* and *Mosley* Rights Are Well-Established and Were Abridged in This Case

The purpose of the *Miranda* decision was to safeguard the long-recognized right against "the compulsion inherent in custodial surroundings":

> We have concluded that without proper safeguards, the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights *and the exercise of those rights must be fully honored*.

*Miranda*, 384 U.S. at 467 (emphasis added).

Among the important protections established by *Miranda* is the "right to cut off questioning," *Miranda v. Arizona*, 384 U.S. 474, which serves as an essential check on "the coercive pressures of the custodial setting" by enabling the suspect to "control the time at which questioning occurs, the subject discussed, and the duration of the interrogation," *Mosley v. Michigan*, 423 U.S. at 96, 103-04 (1975). This right is a "critical safeguard" of the Fifth and Sixth Amendment privileges, *Mosley*, 423 U.S. at 103, and requires the police immediately to cease interrogating a suspect if he "indicates *in any manner, at any time* . . . during questioning, that he wishes to remain silent." *Miranda*, 384 U.S. at 473-74 (emphasis added); *Mosley*, 423 U.S. at 100-02. The rule requiring termination of questioning upon an accused's invocation of his right to silence prevents police from "persisting in repeated efforts to wear down [the accused's] resistance and make him change his mind." *Miranda*, 384 U.S. at 473-74.

Almost a decade after *Miranda*, in *Michigan v. Mosley*, 431 U.S. 96, 106 (1975), the Supreme Court held that the admissibility of incriminating statements obtained after a person in police custody has decided to remain silent and not answer questions depends upon whether his or her right to cut off questioning was "scrupulously honored" by police. 423 U.S. at 104. The rationale underlying the "scrupulously honored" rule in *Mosley* is the same as that in *Miranda*: it is necessary because custodial interrogation by its very nature subtly compels individuals to incriminate themselves. *Miranda*, 384 U.S. at 467 (concluding that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely"); *Mosley*, 423 U.S. at 103-04 (requirement that police cease questioning after right to silence is invoked "counteracts the coercive pressures of the custodial setting").

In *Mosley*, the Supreme Court considered and severely limited when police could attempt further questioning of a suspect who had previously asserted his right to remain silent. Mosley was arrested on robbery charges and advised of his *Miranda* rights. After invoking his right to remain silent, the arresting officer placed him in a detention cell. Approximately two hours later, another officer came to interview the defendant about an unrelated homicide. He gave the suspect another set of *Miranda* warnings, and during the course of the subsequent interrogation, Mosley made incriminating statements. In reviewing the case in light of *Miranda*, the Court concluded that Mosley's invocation of his right to remain silent had been "scrupulously honored" because "[1] the police . . . immediately ceased the interrogation, [2] resumed questioning only after the passage of a significant period of time, and [a] the provision of a fresh set of warnings, and [b] restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Mosley*, 423 U.S. at 106 (emphasis added). The Court noted that *Miranda* cannot "sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent" because such a reading could impermissibly create "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation." *Id.* at 102-03 (emphasis added). The decisive fact allowing new interrogation in *Mosley* was the fact that the accused was questioned about an entirely different crime. That crucial fact justifying the new interrogation is not present in Davie's case. He was repeatedly questioned about the same crime.

In *Mosley* the Court explained that its mandate that "interrogation must cease" after a suspect invokes his right to remain silent does not always permanently prevent the police form resuming questioning. However, neither does the phrase mean — as occurred in this case — that questioning can resume after a short "time out" or that police may try again (and again) to get the suspect to talk to them or make a statement about the same criminal event. *Mosley*, 423 U.S. at 102. To allow questioning on the same subject to resume after only a brief period would "clearly frustrate the purpose of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." *Id.*

### IV. The "Presumption Against Waiver" of the Fifth Amendment Right to Silence and the Sixth Amendment Right to Counsel

The Supreme Court has set a high standard of proof for the waiver of constitutional rights, a standard requiring that courts should "'indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great" to demonstrate a valid waiver, *North Carolina v. Butler*, 441 U.S. 369, 373 (1979), and "[d]oubts must be resolved in favor of protecting the constitutional claim." *Michigan v. Jackson*, 475 U.S. 625, 633 (1986). Where "the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently

waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475.

*Miranda* holds that the defendant may waive the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 475. The inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver *must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it*. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice *and the level of comprehension* may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (emphasis added); *see also North Carolina v. Butler*, 441 U.S. 369, 374-375 (1979). Merely asking the accused whether he understands his rights does not satisfy the duties of an interrogating officer or make admissible any statement of the accused. *Miranda* requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them. *See United States v. Porter*, 764 F.2d 1, 7 (1st Cir. 1985).

If the custodial suspect's right to remain silent has not been "scrupulously honored" throughout the custody, there generally cannot be any subsequent finding of waiver. *See*, *e.g.*, *United States v. Barone*, 968 F.2d 1378 (1st Cir. 1992) (holding that under "*Mosley*, a court need determine specifically whether there has been a voluntary waiver *only after* the government has carried its burden of showing that it complied with [all of] the required procedures") (emphasis added); *Vujosevic v. Rafferty*, 844 F.2d 1023, 1028-31 (3d Cir. 1988) (holding that under *Mosley*, the government failed to demonstrate a valid waiver when police did not "scrupulously honor" the suspect's invocation of his right to remain silent by reinterrogating him about the same crime).

Interpreting *Miranda*, the Supreme Court said in *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (a case in which the accused told his police interrogator that he did not want to talk or waive his right to a lawyer): "an accused's *post-request* responses to further interrogation may not be used to *cast retrospective doubt on the clarity of the initial request itself*." This principle has been followed in many cases. A suspect's claim that the police violated his right to silence by continuing to question him is not negated by the fact that the suspect answered additional questions after the police failed to "scrupulously honor" his request to cease questioning him. Police may not use "post-request" responses "to cast retrospective doubt on the clarity" of the initial request. *See*, *e.g.*, *United States v. Tyler*, 164 F.3d 150, 154-55 (3d Cir. 1988) (the police command to Tyler to "tell the truth" after Tyler invoked his right to remain silent is the "antithesis" of scrupulously honoring his right to remain silent); *United States v. Ramirez*, 79 F.3d 298, 304-05 (2d Cir. 1996) (stating that "once a suspect has unequivocally invoked his right to remain silent whether in the form of refusing to answer questions or asking that an ongoing interrogation be terminated, his request must be scrupulously honored") (internal citations omitted). Therefore, the fact that Davie may have continued to answer questions after verbally expressing his wish not to make a statement does not constitute a waiver. This is as it should be; otherwise police could disregard a defendant's invocation of his rights in the hope that subsequent interrogation would "cast retrospective doubt" on the invocation of the right. *See* Judge Nelson's clear opinion for the court in *McGraw v. Holland*, 257 F.3d 513, 518-19 (6th Cir. 2001) (post-request responses after invocation of right to silence may not be used by the State as a waiver of rights because the continued questioning violates the requirement that the "exercise of the right be scrupulously honored"). *See also* LeFave, Israel & King, *Criminal Procedure* § 6.9(g).

Such interrogation is prohibited where the suspect has clearly and unambiguously invoked his right to silence, as Davie had done numerous times in the previous several hours. "Although the context and nuances of a request to end questioning can create ambiguity, they cannot overcome a clear expression of the desire to remain silent." *United States v. Rambo*, 365 F.3d 906, 910 (10th Cir. 2004). There is no nuance or ambiguity that could vary the unequivocal meaning of Davie's refusal to sign the waiver and his repeated words to the police that morning: "no statement." The only meaning that can be attributed to those words is that Davie wished to exercise his right to remain silent.

In this case, the State and the majority contend that Davie's right to remain silent was "scrupulously honored" because (1) the investigator temporarily ceased questioning him about the case each time he asserted his Fifth Amendment right, and (2) then allowed a short time to pass before any reinterrogation, and (3) then gave him fresh sets of *Miranda* warnings before any reinterrogation. Specifically, they argue that the requirements of *Mosley* were met because when defendant indicated that he did not want to make a statement at the 9:59 A.M. interview, police ceased interrogation. They claim that Davie waived his right to remain silent during the 12:15 P.M. and 2:00 P.M. encounters when he answered their questions after he refused to waive his rights by signing the form.

This claim is mistaken because it assumes that the police may continue interrogation within a couple of hours after the accused had expressly refused to waive his rights at the 9:59 A.M. interview when Davie unequivocally refused to make a statement:

> Blevins:     [D]o you wish to make a statement yes or no.
> Davie:       No statement.
> Blevins:     You wish not to make a statement.
> Davie:       Right.

The 12:15 P.M. interview then began with Detective Sines of the new interrogation team saying to Davie, "I'm Detective Sines and Detective Vingle and we will advise you of your rights, we want to talk to you a little bit. If you have something to tell us, we'll listen to you. If you have nothing to tell us then *we'll go from there* okay." Vingle says, "Okay Rod before we ask you any questions you might understand your rights. Do you understand that right." Although it is not clear what "right" Vingle is inquiring about, Davie answers "Yes." Vingle then read the *Miranda* warning and the waiver portion of the form aloud to Davie. Davie indicated verbally both times that he understood his rights. The officers did not in any way inform Davie that if he did not want to talk the interview would cease. Instead they improperly said "If you have nothing to tell us then we'll go from there okay" — meaning as it turned out that if you do not waive your rights, we will question you anyway.

At the 12:15 interview, Davie again refused to sign the proffered waiver form: "Well I'm not signing the waiver of rights. I didn't sign it earlier." This reply told the officers that Davie thought that the refusal to sign the waiver form was all he had to do to protect himself from self-incrimination. The new detectives again tried to get him to sign the waiver form after asking a few general questions unrelated to the crime. The persistent pressure put upon Davie to sign the waiver form reinforced his belief that his rights were protected as long as he did not sign the waiver. He knew the detectives had tried time after time to get him to sign it. His refusal to sign meant that he had not waived his rights. The rambling 12:15 P.M. interrogation ends with Davie saying he doesn't "remember" anything about what he did that morning, despite repeated attempts by the police to get him to talk about it. For the fourth time within less than four hours, Davie had refused to confess.

It is perfectly clear that the 2:00 P.M. encounter was not a request by Davie to *reinitiate* the interrogation. Therefore, the majority err when they simply concluded that any statements made by

Davie after "reinitiating" contact with the police are admissible.  The mere act of asking a police officer a question does not constitute a waiver of a previously invoked right to remain silent.

Contrary to the majority's characterization of the 2:00 P.M. interrogation as "initiated" by Davie and therefore not worthy of further analysis, it seems obvious that once Davie invoked his Fifth Amendment right to remain silent, the police were obligated to scrupulously honor the right he invoked whenever they interacted with him.  That means that police should not have resumed any interrogation of Davie, either directly or indirectly, by any means without obtaining an unequivocal waiver from Davie.  *See Rhode Island v. Innis*, 446 U.S. 291 (1980).  Vingle's indirect means of resuming the questioning by turning Davie's question back to him was just the sort of improper contact that *Mosley* seeks to prevent.

Consistent with all the previous encounters, Davie again refused to sign the waiver form when the police asked him again for the waiver at 2:00 P.M.  There is no basis for concluding that by asking Officer Vingle a question that Davie intended to waive his right to remain silent and his right to counsel or that he wanted to confess.  The question that Davie asked did not override his earlier unequivocal statements concerning his desire not to make a statement and his deliberate refusal to sign the waiver portion of the form on all of the occasions in which he came in contact with the police.

The First Circuit has stated that the correct course of action would be for the police officer (if he plans to continue to interrogate) to inform the accused that the refusal to sign the waiver does not mean that his statements cannot be used against him.  *United States v. Van Dusen*, 431 F.2d 1278, 1280 (1st Cir. 1970).  The court explained:

> in the delicate area of advising one of his rights, where testimony is often conflicting, *the act of refusing to sign a waiver is concrete and indisputable*.  When such an act occurs, followed by a willingness to talk, this is a signal of some quirk of reasoning which may simply be a dislike of affixing a signature to any document but which may be more.  *It may indicate a serious misunderstanding on the part of the accused*.  In such a succession of events, we wish to make it clear to the courts and prosecutors in this circuit that the burden of persuasion resting on the prosecution measurably increases.

*Id.* (emphasis added).  Investigating officers should clearly inform the accused that his failure to sign the waiver does not prevent statements he makes from being used against him.

Likewise, in *United States v. Heldt*, 745 F.2d 1275 (9th Cir. 1984), Heldt stated that he understood his rights but did not wish to waive them.  He refused to sign the waiver form and told police he did not wish to answer questions.  The officer told him he did not need to sign the waiver form but asked him if he would be willing to answer questions anyway.  The questioning continued for three hours.  Heldt later moved to suppress the admissions he had given to police.  Like the First Circuit in *Van Dusen*, the Ninth Circuit noted that it is the government's burden to prove that a knowing, intelligent and voluntary waiver was given.  The government failed to do so because the prisoner's refusal to sign the waiver form cast "doubt" on any claim that he waived his *Miranda* rights.  The Ninth Circuit suppressed the confession, holding that the government must clearly prove a "knowing and intelligent" waiver when the police continued questioning after a refusal to sign.

As in *Heldt*, Davie's case requires suppression because the police persisted not only after a refusal to sign, but also because they persisted even after Davie expressly invoked his right to silence by refusing to talk.

I, therefore, dissent from the effort by my colleagues to bury *Miranda* under a mountain of AEDPA rhetoric.  Until the Supreme Court overrules *Miranda*, we should follow it, no matter how

much we prefer to side with the police against the liberties created by the Fifth and Sixth Amendments.