Filed 6/18/13  P. v. Buchanan CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

| | |
|---|---|
| THE PEOPLE, | C069081 |
| Plaintiff and Respondent, | (Super. Ct. No. 10-6096) |
| v. | |
| RUSSELL ALEXANDER BUCHANAN, | |
| Defendant and Appellant. | |

A jury convicted defendant Russell Alexander Buchanan of second degree robbery and found that he personally used a firearm during the offense.  In bifurcated proceedings, the trial court found a prior prison term allegation to be true.  The court sentenced defendant to state prison.

Defendant appeals.  He contends the trial court prejudicially erred in admitting his confession into evidence, requiring reversal.  We find no error and will affirm the judgment.

FACTS

At approximately 8:00 a.m. on January 12, 2009, Erick Delgado was talking on his cell phone outside his house in Davis when he felt something pushed against his ribs.  He

1

turned around and saw defendant holding a gun. Defendant ordered, "Give me your money, motherf[-----]." Delgado gave his wallet containing $40 to $80 to defendant. Defendant also demanded Delgado's cell phone. When Delgado protested, defendant responded, "Do you want to die, motherf[-----]?" Delgado gave his cell phone to defendant. Defendant then demanded everything else and Delgado gave some change from his pockets to defendant. Defendant ordered Delgado to walk away and not to turn around. Although in front of his own house, Delgado walked to the corner and saw defendant get in a white car which Delgado had seen minutes before his encounter with defendant. The car left the area. Delgado flagged down a patrol car which came down the street shortly thereafter. Delgado described the robbery and the car. Davis Police Officer Frank Tenedora sent a radio broadcast of the description of the car. About 30 minutes later, Davis Police Officer Benjamin Adams, who had heard the broadcast, saw the white car and stopped it. Defendant, the passenger, fled on foot, holding his pants pocket, and leaving behind Delgado's cell phone under the front passenger seat. Officer Adams sent a radio broadcast of defendant's description. Davis Police Officer Jeff Beasley, who had heard Officer Adams's broadcast, saw defendant running about a block from the stopped car. A black hooded sweatshirt which had been described by Delgado and Officer Adams was found along defendant's path. Defendant got away. Officer Beasley identified defendant as the fleeing passenger. Delgado identified the white car and the driver. Seven .32-caliber centerfire cartridges were found in the car. The next day, defendant was interviewed, admitted robbing Delgado, and wrote a letter of apology to Delgado. The .32-caliber handgun defendant used in the robbery was found in his girlfriend's house.

Although unable to identify defendant's photo the afternoon of the robbery, Delgado identified defendant at trial which was the first time after Delgado was robbed that he had seen defendant. The photo of defendant had been taken approximately six months before it had been shown to Delgado.

## DISCUSSION

Defendant contends the trial court improperly admitted his confession into evidence since it was obtained after he validly invoked his right to remain silent. We disagree. Defendant's words and conduct in totality never indicated a present unwillingness to discuss the robbery. As the trial court determined, defendant did not invoke his right in a clear and unequivocal manner. We conclude that the trial court did not err in admitting defendant's confession into evidence.

### *Background*

On January 13, 2009, defendant was interviewed by Fairfield Police Detective Robert Wilkie while in custody at the Fairfield Police Department. Detective Wilkie, who had been an officer for more than 15 years, advised defendant of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*), reading from a POST-approved[1] card. Defendant stated that he understood his rights. Detective Wilkie then asked defendant about a shooting in Fairfield and defendant answered the detective's questions, confessing to shooting the person. During the interview, defendant was emotional and crying. He admitted he knew he was in trouble and was concerned about a life sentence, claiming that he had not tried to kill anyone. Defendant stated that he knew he would have to serve time and confessed to the shooting so he could resolve it and see his "girlfriend again," explaining they planned to get married and to have children. Before Detective Wilkie left the interview room, defendant stated that he thought he would be charged with attempted murder, get 20 years, and that his life was over. During the questioning, defendant did not state that he no longer wanted to answer questions.

Davis Police Detective Scott Allen, who had been an officer for 16 years, arrived at the Fairfield Police Department while the interview between Detective Wilkie and

---

[1] POST is the acronym for Peace Officer Standards and Training.

defendant was in progress. Detective Allen watched the interview. After defendant confessed to the Fairfield shooting, Detective Allen entered the interview room, was introduced, and joined the conversation with Detective Wilkie and defendant. Prior to entering the room, Detective Allen asked the Fairfield detective whether defendant had been provided his *Miranda* rights and was informed that defendant had been. Detective Allen spoke to defendant about his cooperation with the Fairfield officers and his drug binge. Detective Wilkie informed defendant that his photo had been shared with Detective Allen. Detective Allen then asked about the Davis robbery:

"[Detective Allen]: Does it surprise you at all that I'm here?

"[Defendant]: I guess so, yeah. I mean because this is already too much for me to handle.

"[Detective Allen]: Okay. Well, here's what I want to do, okay? Um, what I want to do is get everything done today so you don't have to revisit this.

"[Defendant]: Okay.

"[Detective Allen]: Okay? And the detectives tell me that you're -- you've actually been doing pretty good lately.

"[Defendant]: Yes. Except for that s[---].

"[Detective Allen]: And that you -- that you got a -- and that you got a woman that you want to make it right with?

"[Defendant]: Yeah. I know we've been talking about getting married when she's 18 and having kids.

"[Detective Allen]: Okay. That's all still possible, getting married.

"[Defendant]: That's only like a year away though. That's not possible.

"[Detective Allen]: Oh, you got a lot of time to get married.

"[Defendant]: I'm never getting out.

"[Detective Allen]: Look, now listen.

"[Defendant]: And (unintelligible) I'm going to have nothing.

4

"[Detective Allen]:  Listen.

"[Defendant]:  My parents aren't going to let me live there either.

"[Detective Allen]:  Okay.  What I want to get settled today is everything that happened while you were out on your little drug binge.  Okay?  Okay?  Everybody makes mistakes man.  Everybody makes mistakes.  I don't want you to have to pay for it three years from now.

"[Defendant]:  But I am though.  I just got caught up with a little bit of meth and I'm still paying for it.

"[Detective Allen]:  No man.  Either . . . .

"[Defendant]:  Three years later.

"[Detective Allen]:  Either it happened because it was a mistake because you were on drugs or whatever or you did these things um, on purpose, like you're some master criminal that just goes out and does this stuff all the time, and I don't think that's the case.

"[Defendant]:  No.  No.

"[Detective Allen]:  That's why I want to get it all settled now.

"[Defendant]:  (Unintelligible).

"[Detective Allen]:  That's why I want to get it all settled now.

"[Defendant]:  Okay.

"[Detective Allen]:  Okay.  Let's talk about Davis, yesterday and let's get it done and over with.  We're already here.

"[Defendant]:  Okay.

"[Detective Allen]:  Okay?  What were you doing in Davis yesterday?

"[Defendant]:  *I don't even really want to talk about it.*

"[Detective Allen]:  Come on Russell.  I know you don't.  That's obvious.  I wouldn't want to either, okay?

5

"[Detective Wilkie]: That photo line up that I told you all my people here in Fairfield picked you out in there? They recognize the description from a teletype they sent out and I gave them that photo line up.

"[Detective Allen]: We use the same -- we used the same line up.

"[Detective Wilkie]: They used the same line up. Okay?

"[Defendant]: Yeah, so someone pointed me out I'm guessing, right?

"[Detective Allen]: Yeah. Somebody pointed you out.

"[Defendant]: Man, you probably got fingerprints and all that s[---] and all that and . . . ." (Italics added.)

Defendant confessed to the Davis robbery and admitted using the same gun, a .32-caliber handgun, as he had used in the Fairfield shooting. Defendant explained he bought the gun off the street for a few hundred dollars. At the conclusion of the interview, defendant wrote a letter to Delgado, apologizing for the robbery.

At the preliminary hearing, defendant argued that his confession was inadmissible having been obtained in violation of *Miranda*, after he asserted his right to remain silent. Detectives Wilkie and Allen testified about their interview with defendant and his statement. Detective Wilkie spoke with defendant intermittently for almost four hours. During that time, defendant never indicated that he wanted to stop the interview. When Detective Wilkie left the interview room, Detective Allen asked whether defendant had been given his *Miranda* rights. Having been informed that defendant had been, Detective Allen entered the interview room and questioned defendant about the Davis robbery. Detective Allen interpreted defendant's statement that he did not "really want to talk" about the Davis robbery as an indication that it was difficult and embarrassing for him to talk about it based on the interview up to that point. Defendant answered the detective's questions and did not indicate that he wanted the interview to end.

Concluding defendant's statement reflected "an ambiguity in the phrase and an ambiguity in the context," the court ruled that defendant did not unequivocally invoke his

6

right to remain silent. After reviewing a portion of both the video recording and accompanying transcript of the interview, the court reaffirmed its ruling, finding defendant's statement was less than and "not as strong a statement of someone saying, 'That's it, I shut up,'" which is what they were dealing with in the [*People v. Jennings* (1988) 46 Cal.3d 963 (*Jennings*)] case." The court noted that defendant did not say that he was finished talking, that he did not want to answer any more questions, or that he was not saying anything else. The court concluded that defendant's statement reflected someone who knew he was in "a bad situation," not that he did not want to talk anymore. The court denied defendant's motion to exclude the evidence.

Defendant filed a motion to set aside the information, renewing his argument that his constitutional right against self-incrimination was violated when Detective Allen failed to terminate the interview after defendant invoked his right to remain silent which rendered his confession inadmissible. Defendant claimed there was insufficient admissible evidence to establish that he committed the offense. The court denied the motion, concluding that defendant had expressed some discomfort in discussing the Davis robbery but did not assert his right to remain silent.

Defendant also raised the issue in his pretrial motion to exclude evidence. The court denied defendant's motion to exclude his confession, concluding that defendant's statement was not "reasonably inconsistent with the present willingness to talk." The court noted that defendant had been given his rights by the Fairfield detective, defendant had spoken with him for "almost an hour before he was introduced to [Detective] Allen," and defendant had "freely acknowledged his culpability for several crimes" in Fairfield. The court also noted that Detective Allen asked "innocuous questions" which defendant answered, indicating no animosity towards Detective Allen. In analyzing the meaning of defendant's response "I don't even really want to talk about it" when asked about his presence in "Davis yesterday," the court, having reviewed the video recording, commented that defendant's tone and cadence had not changed and concluded that

7

defendant's response was not "assertive" but instead was "equivocal."  The court stated that defendant's next response about someone pointing him out made "it clear that he is, in fact, willing to talk about what happened in Davis."  The court found that defendant "never made any unequivocal assertion to his right to remain silent."

*Analysis*

Defendant contends the trial court erred in admitting his confession, arguing the questioning should have ended when he stated that he did not want to talk about the Davis robbery.  We reject defendant's contention; thus, we do not reach prejudice.

We independently review the record to determine whether a *Miranda* violation has occurred but "we may ' "give great weight to the considered conclusions" ' of the trial court."  (*People v. Nelson* (2012) 53 Cal.4th 367, 380 (*Nelson*).)

A defendant invokes his right to remain silent "by any words or conduct reasonably inconsistent with a present willingness to discuss the case freely and completely."  (*People v. Crittenden* (1994) 9 Cal.4th 83, 129.)  If a defendant indicates in any manner, prior to or during interrogation, that he is invoking his right to remain silent, the interrogation must cease.  (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238.)  " 'Whether the suspect has indeed invoked that right, however, is a question of fact to be decided in the light of all of the circumstances . . . .'  [Citation.]" (*Ibid.*)

A defendant may refuse to answer certain questions "without manifesting a desire to terminate 'an interrogation already in progress.' "  (*People v. Silva* (1988) 45 Cal.3d 604, 629-630 (*Silva*).)  "[A]fter a suspect makes a valid waiver of the *Miranda* rights, the need for effective law enforcement weighs in favor of a bright-line rule that allows officers to continue questioning unless the suspect clearly invokes the right to . . . silence."  (*Nelson, supra,* 53 Cal.4th at p. 377.)

If invoked midinterrogation, a defendant's words or conduct must be clear and unambiguous.  (*People v. Williams* (2010) 49 Cal.4th 405, 434 (*Williams*), citing *Berghuis v. Thompkins* (2010) 560 U.S. 370, ___ [176 L.Ed.2d 1098, 1110]

8

(*Thompkins*).)  The words used by defendant must be construed in context.  (*Williams, supra,* 49 Cal.4th at pp. 433-434 [" 'I don't want to talk about it' " not an invocation of right but rather an expression of frustration with the officer's refusal to accept the defendant's repeated denials]; *People v. Wash* (1993) 6 Cal.4th 215, 237-239 [" 'I don't know if I wanna talk anymore' " not an invocation of right but instead uncertainty whether he wished to continue]; *Jennings, supra,* 46 Cal.3d at pp. 977-979 [" 'I'm not going to talk . . . [t]hat's it' " and " 'I shut up' " in context "reflect[ed] only momentary frustration and animosity" towards one of the questioning officers, not an invocation of right]; *Silva, supra,* 45 Cal.3d at pp. 629-630 [" 'I really don't want to talk about that' " not an invocation of right but desire not to talk about whether he was driving]; *In re Joe R.* (1980) 27 Cal.3d 496, 514-516 [when his veracity was challenged and he was confronted with adverse evidence, the minor responded, " 'That's all I have to say' "; not an unequivocal invocation of his right but simply a statement to the effect of, "That's my story, and I'll stick with it"].)

Here, the question is whether defendant stated his desire to be silent about the Davis robbery clearly so that a reasonable officer in the circumstances would have understood defendant to be saying that he wanted to exercise his right to remain silent. (*Nelson, supra,* 53 Cal.4th at p. 376.)  Defendant claims the trial court's conclusion that he did not is not supportable.  We disagree.

Defendant argues that the trial court's reliance upon the interrogation about the Fairfield shooting for more than an hour was in error since the Davis robbery was unconnected in time and place to the Fairfield shooting and was discussed with a different officer.  Relying upon *Michigan v. Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313] (*Mosley*) and *Davie v. Mitchell* (6th Cir. 2008) 547 F.3d 297 (*Mitchell*), defendant argues that the interrogation about the Davis robbery was a distinct interrogation and that his decision to waive his *Miranda* rights with respect to the Fairfield shooting was not determinative of whether he invoked his rights in connection with the Davis robbery.  We

9

conclude that the trial court properly considered, along with several other factors, defendant's implied waiver in freely and completely discussing the Fairfield shooting at length.

In *Mosley*, after being read the *Miranda* warnings, the defendant stated he did not want to discuss the robberies and Detective Cowie immediately stopped his questioning of the defendant. More than two hours later, another officer at another location questioned the defendant about a homicide after giving the defendant the *Miranda* warnings. *Mosley* held the defendant's right to cut off questioning by Detective Cowie was scrupulously honored and did not preclude the later interrogation by another officer. (*Mosley, supra,* 423 U.S. at pp. 104-107 [46 L.Ed.2d at pp. 321-323].)

Here, the Davis robbery interrogation occurred on the same day, at the same place, and during the same session of questioning, although by a different officer (Detective Allen). Before defendant was questioned that day, Detective Wilkie read defendant his rights and he chose to waive them, unlike the defendant in *Mosley*. *Mosley* is of no assistance to defendant.

In finding that the defendant waived his *Miranda* rights, *Mitchell* discussed *Mosley*, noting that in both cases the defendant had cut off questioning and after an interval of time, officers had contacted the defendant. (*Mitchell, supra,* 547 F.3d at p. 309.) Disagreeing with the dissent, the majority determined that *Mosley* "does not require that the repeated questioning involve a wholly different crime." (*Mitchell, supra,* 547 F.3d at p. 310 (lead opn.); *id.* at p. 322 (conc. opn.) [" 'a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview' "]; *id.* at p. 331 (dis. opn.) ["[t]he decisive fact allowing new interrogation in *Mosley* was the fact that the accused was questioned about an entirely different crime"].)

Defendant mistakenly relies upon the dissenting opinion in *Mitchell*. Further, there was no second interrogation within the meaning of *Mosley*.

10

Defendant also complains the trial court erroneously cited the innocuous questioning by Detective Allen and defendant's tone as factors in finding defendant did not indicate he did not want to discuss the Davis robbery. We reject defendant's complaints. The trial court was discussing the context in which defendant made his statement; context, of course, was relevant to its ruling. We reject defendant's challenge to the trial court's observations of defendant's tone when he made his statement. Our review of the video recording supports the trial court's findings that based on defendant's tone and cadence, his statement was not assertive but instead was equivocal.

Because we conclude that defendant did not clearly invoke his right to remain silent, we also reject defendant's claims that Detective Allen failed to scrupulously honor defendant's invocation of his right to remain silent, that in referring to the photo lineup, Detective Allen attempted to wear down defendant's resistance and make him change his mind, and that defendant's responses afterwards cannot be used to cast doubt on the clarity of invocation of his right to remain silent. The trial court properly considered defendant's responses afterwards because he had not clearly invoked his right to remain silent; his responses afterwards reflect that he was willing to discuss the Davis robbery.

Initially, defendant was questioned by Detective Wilkie about the Fairfield shooting. Detective Wilkie informed defendant of his rights pursuant to *Miranda*. Defendant stated that he understood, conversed with Detective Wilkie about the Fairfield shooting, and confessed to being the shooter. During the interview with Detective Wilkie, defendant was emotional, concerned about a life sentence and the impact it would have on his plans to marry and have children. When Detective Allen entered the room, defendant had already been advised of his rights pursuant to *Miranda* and, having understood his rights, had already willingly answered questions posed by Detective Wilkie. Detective Allen noted defendant's cooperation with Detective Wilkie and mentioned defendant's girlfriend. Emotional and crying, defendant talked about her, his belief that he would not be able to fulfill their plans to marry and have children, and that

11

he would even lose his parents' support in a place to live, because he would be confined for a long time. Detective Allen encouraged defendant to resolve all crimes that occurred while he was on his "little drug binge." When Detective Allen stated, "Let's talk about Davis, yesterday and let's get it done and over with" since "[w]e're already here," defendant responded, "Okay." When Detective Allen asked what defendant was doing in Davis "yesterday," defendant responded, "I don't even really want to talk about it." Detective Allen further encouraged defendant, "Come on, Russell. I know you don't. That's obvious." When Detectives Wilkie and Allen talked about the Fairfield photo lineup having been used in Davis, defendant continued the conversation and surmised that someone had pointed him out in Davis, just as someone had in Fairfield.

Defendant complains that even Detective Allen had acknowledged defendant's invocation of his right to remain silent when the detective responded, "I know you don't. . . . I wouldn't either." We disagree. A reasonable officer would construe defendant's response, in context, as ambiguous and expressing uncertainty as to whether he wanted to continue in view of the Fairfield crime to which he had just confessed, the amount of time he faced for the shooting, and his concern about his girlfriend and their future plans.[2]

We need not discuss the cases defendant cites, comparing and contrasting the statements the defendants made, because defendant's words and conduct in context here are determinative. (See *People v. Martinez* (2010) 47 Cal.4th 911, 951.) For example, in support of his claim that his statement is similar to those statements courts have held constitute an invocation of the right to remain silent, defendant cites *People v. Peracchi*

---

[2] At the preliminary hearing, Detective Allen testified that he construed defendant's response as indicating that it was difficult and embarrassing for him to discuss his crime spree. As defendant states, Detective Allen's subjective interpretation is not the test but instead a reasonable officer test applies. (*Nelson*, *supra*, 53 Cal.4th at pp. 376-378.)

(2001) 86 Cal.App.4th 353. *Martinez, supra,* 47 Cal.4th 911 discussed *Peracchi* as follows: "In *Peracchi*, after the officer read the defendant his *Miranda* rights and asked the defendant whether he wanted to talk, the defendant responded, 'At this point, I don't think so. At this point, I don't think I can talk.' When the officer tried to clarify, the defendant explained that his head was 'not clear enough' to discuss the charges against him 'right now.' When the officer again tried to clarify, the defendant said, 'I don't want to discuss it right now.' The officer asked why, and the defendant then made statements incriminating himself. [Citation.] The *Peracchi* court concluded that the officer's first attempts to clarify the defendant's statements were proper, but once the defendant stated, ' "I don't want to discuss it right now," ' he was 'clearly indicating that he intended to invoke his right to remain silent' and the officer thereafter improperly continued to interrogate because '[o]fficers have no legitimate need or reason to inquire into the reasons why a suspect wishes to remain silent.' [Citation.] [¶] *Although defendant's statement here is similar to the one uttered in Peracchi, the context in which it was uttered is markedly different. Peracchi* involved a *Miranda* waiver, not an invocation during the course of an interrogation. *'Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.'* [Citation.] The defendant in *Peracchi* invoked his right to silence at the outset of the interrogation, making clear he did not wish to waive his right to silence at that time." (*Martinez, supra,* 47 Cal.4th at p. 951, italics added.) Here, defendant claims he invoked his right to silence during the course of the interrogation. *Peracchi* is of no assistance to defendant.

Contrary to defendant's claim, it is not reasonable to construe his statement midinterrogation as invoking his right to remain silent. Defendant's statement, in context, reflects that he recognized he was in trouble for the Davis robbery as well as the Fairfield shooting, not that he wanted to stop answering questions. Defendant did not invoke his right to remain silent. In response to Detective Allen asking about what defendant was doing in Davis the day before, defendant "did not say that he wanted to

13

remain silent or that he did not want to talk [to Detective Allen].  Had he made either of these simple, unambiguous statements, he would have invoked his ' "right to cut off questioning." ' [Citation.]" (*Thompkins, supra,* 560 U.S. at p. ___ [176 L.Ed.2d at p. 1111].)  Instead, after freely discussing the shooting in Fairfield, defendant said that he "[did not] *even really* want to talk about" his presence in Davis the day before and then engaged in further conversation with the detectives.  We find no violation of defendant's *Miranda* rights.  The trial court did not err in denying defendant's motion to exclude his confession.

## DISPOSITION

The judgment is affirmed.


    BLEASE        , Acting P. J.


We concur:


    NICHOLSON    , J.


    BUTZ       , J.